STATE of Tennessee ex rel. Charles A.
MANER, Jr., Appellee,

v.

William M. LEECH, Jr., the Attorney
General of Tennessee, et al.,
Appellants.

Supreme Court of Tennessee.

Oct. 9, 1979.

Kenneth R. Herrell, Asst. Atty. Gen., William M. Leech, Jr., Atty. Gen., Nashville, for the Atty. Gen.

Earl S. Ailor, Asquith, Ailor & Jones, Knoxville, for Judge C. Howard Bozeman.

Foster D. Arnett, Lewis R. Hagood, Arnett, Draper & Hagood, Knoxville, for Com'rs of Knox County; Frederic S. LeClercq, Knoxville, of counsel.

Dale C. Workman, Asst. Law Director, Charles A. Maner, Jr., Law Director, Knox County, Knoxville, for relator.

Jonathan H. Burnett, Hodges, Doughty & Carson, Knoxville, for Members of Knox County Quarterly Court.

## OPINION

HENRY, Justice.

This is another lawsuit coming in the wake of the adoption of Chapter 934 of the Public Acts of 1978, the legislative enactment designed to implement certain local government provisions of the 1977 amendments to Article VII of the Constitution of Tennessee.

The specific issue is whether Section 35(b) of the Public Acts of 1978, carried forward into the Official Code as Section 5–551(b), T.C.A., violates Article XI, Section 9 of the Constitution in that it applies only to Knox County and its effectiveness is not conditioned upon approval by the local legislative body or a referendum. The Trial Judge held the section to be unconstitutional, ordered a special election for the purpose of electing a county executive and a county legislative body, and held that upon the election of a county executive the county judge would "exercise only the judicial functions of an inferior court." We respectfully differ with the Trial Judge and reverse.

The parties defendant to this action are The Attorney General of the State, the County Judge of Knox County, the three County Commissioners, members of the Quarterly Court and the Knox County Election Commission (nominal and as to relief only).

The Relator is the Law Director of Knox County. He sues in that capacity and as a private attorney general. After an evidentiary hearing the Trial Judge permitted the suit under the authority of *Bennett v. Stutts*, 521 S.W.2d 575 (Tenn.1975).[1]

I.

*Knox County Government Today*

Knox County is governed by a county judge, three commissioners and a quarterly county court.

The office of county judge is of comparatively ancient origin. It exists by virtue of Chapter 148 of the Private Acts of 1887 and a number of acts amendatory thereto.[2] The incumbent County Judge, the Honorable C. Howard Bozeman, assumed his present term on September 1, 1974, for an eight-year term expiring August 31, 1982. He has judicial, fiscal and administrative duties, powers and responsibilities.

A commission form of government was established by Chapter 183 of the Private Acts of 1937.[3] The stated purpose of the creating Act was to "centralize, consolidate and reorganize county administrative affairs." *See* caption of Act. The Act creates three commissioners, *viz*: the Commissioner of Highways, the Commissioner of Finance and the Commissioner of Health, Welfare and Institutions. Each commissioner was last elected in August 1978 for a two-year term beginning September 1, 1978 and expiring on August 31, 1980.

The recent history of the Quarterly Court of Knox County has been more tempestuous than tranquil. Tennessee justices of the peace are elected for six-year terms. Article 6, Section 15, Constitution of Tennessee. They are elected every six years counting from the first Thursday in August 1870. Section 2–103, T.C.A. (bound volume). This means that the terms of all Tennessee justices of the peace expired on August 31, 1978. Not so, however, in Knox County.

In the case of *Hardy v. McCanless*, Knox Chancery, No. 45,600 (May 10, 1968), the Knox County Quarterly Court was reapportioned. As a part of that reapportionment, the Court's final decree ordered that the terms of justices of the peace elected in August 1970 "will be for six years from and after September 1, 1970." There was no appeal, hence, the members of the Quarterly Court of Knox County began serving terms at variance with those fixed by Constitution and statute.

Some nine years later the case of *Schaad v. Knox County Election Commission*, Knox Chancery, No. 60,666 (Aug. 2, 1977) was filed. Plaintiffs justices of the peace asserted that they had been elected to six-

---

1. The question of standing was withdrawn during the course of oral argument. This question, therefore, is not before the Court. This opinion proceeds upon the assumption that the question of standing was properly decided in the trial court.

2. See *Perry v. Banks*, 521 S.W.2d 549, 550–51 (Tenn.1975) (Henry, J., and Fones, C. J., dissenting) for history and comment upon the governing statutes.

3. The constitutionality of this act was upheld in *Troutman v. Crippen*, 186 Tenn. 459, 212 S.W.2d 33 (1937).

year terms beginning September 1, 1976. The Court, in a Declaratory Judgment, declared that Plaintiffs were entitled to serve full six-year terms from September 1, 1976, and running until August 31, 1982; that at the August 1982 election justices of the peace would be elected for two-year terms "in order to bring this county back into synchronization with the six-year cycle" required by the Constitution. This decision was not appealed.

Thus it is that under the Constitution and general statutes the terms of all justices of the peace expired August 31, 1978; whereas, by final court decree, those in Knox County do not expire until August 31, 1982. This matter is not before the Court for adjudication. For purposes of this opinion we assume that there is a properly elected quarterly county court in Knox County and that the terms of its members expire on August 31, 1982.

This was the status of Knox County's government when the amendments proposed by the Limited Constitutional Convention were ratified on March 7, 1978, and is its status today.

## II.

### Constitutional Amendments

The Constitution of 1870 was silent as to the structure of county government. Article VII, Section 1, enumerated various county officers, and Section 2 determined the proper method of filling vacancies.

The Constitutional Convention of 1977 extensively rewrote these sections and provided a general framework for the government of Tennessee counties. A new office of county executive was created and, in place of the quarterly court, the amended Constitution provides for a legislative body. In pertinent part, Article VII, Section 1, now provides:

> The qualified voters of each county shall elect for terms of four years a legislative body, a county executive. . . . Their qualifications shall be prescribed by the General Assembly.

> \*　\*　\*　\*　\*　\*

> Any county organized under the consolidated government provisions of Article XI, Section 9, of this Constitution shall be exempt from having a county executive and a county legislative body as described in this paragraph.

> The General Assembly may provide alternate forms of county government including the right to charter and the manner by which a referendum may be called. The new form of government shall replace the existing form if approved by a majority of the voters in the referendum. No officeholder's current term shall be diminished by the ratification of this article.

It is evident that, in broad form, our Constitution now provides for three types of county government:

a. Article VII government wherein the basic units of government are the county executive and the county legislative body.

b. A consolidated form of government commonly known as Metropolitan or "Metro." [4] See Article XI, Section 9, last paragraph. Any county having such a government is exempt from Article VII government.

c. An alternate form of government—either chartered or unchartered—created by the General Assembly. Under this proviso the legislature is specifically authorized to create diverse forms of county government without regard to the general type established in Article VII.

When the legislature authorizes any deviation from Article VII government its action must be ratified by the people in a referendum called for that purpose.

■ These constitutional provisions were not self-executing; [5] legislative action was

---

4. The Metropolitan Government of Nashville and Davidson County is the only such consolidated government in Tennessee.

5. See Washington County Election Commission v. City of Johnson, 209 Tenn. 131, 350 S.W.2d 601 (1961); Biggs v. Beeler, 180 Tenn. 198, 173

required to give them vitality. The legislature responded with a carefully considered and comprehensive plan of implementation, to wit: Chapter 934 of the Public Acts of 1978, which appears in the Official Code as Chapters 5 and 6 of Title 5 (Section 5–501, *et seq.,* and Section 5–601, *et seq.*)

## III.

### *The Implemental Legislation*

The General Assembly was faced with a two-fold problem.

First, it had to provide the specifics of the new basic structure for county government in Tennessee.

Secondly, it had to provide an orderly method of transition.

The General Assembly recognized the "complexity" of county government in Tennessee, the "myriad" problems posed by provisions of general and private acts establishing the duties and responsibilities of county officials, and emphasized the need to

> provide a transition which will assure orderly election of county officers, minimum disruption in the upcoming regular August election, and continuity of county government. Ch. 934, § 42, Acts of 1978.

It is evident from Chapter 934 that the Legislature had full knowledge that while most Tennessee counties had the county judges or county chairmen and quarterly courts, others had county managers, county councils, county commissioners, and other combinations or forms of government.[6]

It must be borne in mind that the Legislature, by the enactment of Chapter 934, has established *for the time being* the same form of government in all counties of Tennessee except those having a consolidated or metropolitan government and those enumerated or identifiable under Section 5–551, T.C.A. *See* Sections 5–501 and 5–601. We say, "for the time being," because, responsive to Article VII of the Constitution, further counties may adopt metropolitan government and all counties may have an alternate form of government, in each instance with legislative action and popular approval.

Section 42, Acts of 1978, additionally reads, in part, as follows:

> The General Assembly further finds and declares that in certain counties where there exist alternative forms of county government, the failure to provide a reasonable period of transition to alter the form of county government created by this act will be disruptive of the orderly process of government in such counties and will create unique problems which can be better resolved by the General Assembly during the period of transition and by the voters of such counties if they desire to adopt an alternative form of county government pursuant to Article VII or Article XI of the Tennessee Constitution.

This language is unfortunate. Read literally all counties had "alternative forms of county government" because none had Article VII government. Apparently the Legislature had in mind the counties excepted under Section 35 of the Act (Section 5–551, T.C.A.), where transition in some instances would have been troublesome. All that may be said with certainty is that the legislature showed a commendable concern for an orderly transition.

The ensuing sentence is even more confusing:

> It is the intention of the General Assembly by this act to *create a uniform system of county government* by the establishment of the county legislative body and the office of county executive as the basic units of government, while providing a reasonable period of transition for certain counties to avoid the disruptive effects of rapid change in their government. (Emphasis supplied).

---

S.W.2d 144, 946 (1943); *Friedman v. Mathes,* 55 Tenn. 488 (1872).

**6.** *See Leech v. Wayne County,* —— S.W.2d —— (Tenn.1979) (filed Sept. 24, 1979), for further discussion and identity of counties.

A literal reading of this language produces the conclusion that the Act creates *a uniform system of county government* to which all counties, except those having metropolitan government, must ultimately convert. Read thusly, the Act would be at variance with the Constitution and at odds with the general scheme of the Act itself. Again, the Act creates a basic plan of county government, applicable to all Tennessee counties except a county having metropolitan government, and those opting for a consolidated or an "alternate" form in the future. Thus, the form of government, subject to Section 5–551, is uniform "for the time being."

■ The declaration of legislative intent (not codified) must yield to the clear language of the Act and its evident purposes. The fact that this language conflicts with remaining portions of the Act and does not harmonize with the Constitution has no catastrophic result. A special provision takes priority over a general provision within a statute, *Woodroof v. City of Nashville*, 183 Tenn. 483, 192 S.W.2d 1013 (1946). Other special and specific provisions of the Act prevail. The Act itself comports, in the totality of its objectives and provisions, with our basic charter.

It is the language of this section that has caused much of the confusion in this case. This Court perceives no significant problems and has sought to clarify this situation

as a part of the decision in this action and as a guideline for use in other litigation.

### IV.

*Transitional Provisions for Knox County*

■ The General Assembly, in the adoption of the implemental legislation, very properly balanced the existing situation in Knox County against the demands for interim adherence to an ultimate standard set by the legislature to provide a constitutional and basic form of government.

Section 35 of the Act carried forward into the Official Code as Section 5–551 contains transitional provisions. Subsection (b)[7] relates to Knox County. The first paragraph of the subsection recites a legislative intent to provide a reasonable transition period within which to establish a new form of county government. This is in keeping with the theory and intent of the Act. Next it recognizes that it has been judicially decreed that the terms of office of the present members of the quarterly county court do not expire until 1982. This is in keeping with the constitutional mandate that "[n]o officeholder's current term shall be diminished by the ratification of this Article." Article VII, Section 1, Constitution of Tennessee.

Next the Legislature recognizes that the adoption of a metropolitan form of govern-

---

**7.** The first three paragraphs of Section 5–551(b) read as follows:

County Board of Commissioners in Knox County. It is the legislative intent of this subsection to provide a reasonable transition period for counties having a county board of commissioners form of government on January 1, 1978, to establish a new form of county government. Since it has been judicially decreed that the present term of members of the quarterly county court in such counties shall extend until 1982 and since a measure to organize the government of such counties as a metropolitan form of government under Article XI, § 9, is now pending and is scheduled to be voted on by the people in the 1978 regular November election, it is declared to be the intention of the general assembly to alter the form of government in such counties on September 1, 1980.

With respect to any county having a county board of commissioners form of government

established by private act, the form of government of such county existing on January 1, 1978, except for the term of office of certain members of the commission shall remain in form, effect and operation until September 1, 1980. Notwithstanding the provisions of any private act to the contrary, the term of county commissioners elected at the 1978 regular August election shall be two (2) years and shall expire on August 31, 1980, and such county offices shall be abolished on September 1, 1980.

If an alternate form of government is not established prior to January 1, 1980, the form of county government shall be determined in accordance with chapters 1, 5 and 6 of this title and in the regular August election of 1980, a county executive and a county legislative body shall be elected as provided by the laws governing the election of county officials in such county.

ment "is now pending and is scheduled to be voted upon by the people in the 1978 regular November election." [8] Therefore, the Legislature announces an intent to alter the form of government on September 1, 1980. This latter provision, construed with the third paragraph of the section, means a new form of government, which may or may not be in the form of a metropolitan charter.

Thus, the first paragraph of Section 5–551(b) was in the nature of a preamble reciting legislative intent.

The second paragraph continues the form of government until September 1, 1980, except for the terms of office of the commissioners. [The three commissioners were privileged to run for election in August 1978 and did so. See Section II, *supra*]. This is yet another transitional provision. It specifies that their terms shall be two years and end September 1, 1980 [actually August 31, 1980]. This is but a repetition of existing law.

■ Finally, the third paragraph provides in substance that if an "alternate form of government" is not established prior to January 1, 1980, Article VII government as established by the Act comes into existence. The phrase "alternate form of government" must be construed to mean metropolitan government but necessarily includes such other "alternate" forms as may be established by the Legislature and approved by the people. If such a form of government is not adopted, a county executive and a county legislative body shall be elected at the August election in 1980. Implicit in this paragraph is the proposition that if a metropolitan charter were adopted, it would become the effective government of Knoxville and Knox County.

We find no constitutional infirmity in this section. Reduced to simplicities it merely provides the people of Knox County an opportunity to join with the City of Knox-

ville in creating a consolidated form of government, one of the three broad types of governmental devices specifically recognized by our Constitution.

By preserving the status quo, pending the action of the people at the metropolitan referendum, the General Assembly abided both the spirit and the letter of our Constitution and did not compromise any of its principles.

The metropolitan charter was not adopted with the result that the basic form of Tennessee county government goes into effect in 1980. This is the legislative scheme; we believe it to be valid.

■ It is the duty of this constitutional court of last resort to resolve every reasonable doubt in favor of the constitutionality of a legislative enactment, *Blankenship v. Old Republic Insurance Co.*, 539 S.W.2d 23 (Tenn.1976); indeed there is a strong presumption in favor of their constitutionality. *Bozeman v. Barker*, 571 S.W.2d 279 (Tenn. 1978). This thrusts upon those who attack a statute a heavy burden. *West v. Tennessee Housing Agency*, 512 S.W.2d 275 (Tenn. 1974).

It has been said that statutes must be construed "with the saving grace of common sense." Our courts have repeatedly held that absurdities should be avoided, *Roberts v. Cahill Forge & Foundry Co.*, 181 Tenn. 688, 184 S.W.2d 29 (1944); that the courts should not place upon a statute a construction which would work to the prejudice of the public interest, *Burns v. Duncan*, 23 Tenn.App. 374, 133 S.W.2d 1000 (1939), and a construction which impairs, frustrates or defeats the object of a statute should be avoided, *First National Bank v. McCanless*, 186 Tenn. 1, 207 S.W.2d 1007 (1948). These holdings are analogous to the instant case.

The General Assembly was motivated by a stated intent to "assure orderly election of

---

8. In 1977 a metropolitan charter commission was created by the Knox County Quarterly Court and the Knoxville City Council. A metropolitan charter commission was appointed, held extensive hearings, and submitted a pro-

posed charter. It was rejected in an election conducted November 7, 1978, eight months after the amendment to the Constitution was ratified.

county officers, minimum disruption . . and continuity of county government."

Assume, for the purpose of demonstrating the chaotic condition that would have existed in Knox County, that the Legislature did not include Section 35(b). Assume further the success of the referendum on metropolitan government.[9] The result would have been that Knox County would have been served:

a. by a board of commissioners until September 1, 1978;

b. by a county executive and county legislative body from September 1, 1978, until July 1, 1979, the proposed effective date of metro.

c. by a metropolitan charter form of government commencing July 1, 1979.

Thus Knox County would have had three governments in less than one year. The Legislature acted responsibly and on a reasoned and rational basis in providing a hiatus in the implementation of an Article VII form of government. The foreseeable result of a contrary course would have been massive confusion, acute fiscal detriment and citizen discontent. The proper performance of the legislative function demands that legislation designed to restructure county government be adapted to minimize disruption, promote orderly transition, conserve public funds and respect the interests of the involved citizenry. The quotation from Justice Holmes by counsel for the commissioners is apt: "We must remember that the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482 (1931).

The Chancellor, in declaring Section 5–551(b) unconstitutional, relied upon *Farris v. Blanton*, 528 S.W.2d 549 (Tenn.1975), and correctly quoted this Court as holding:

The test is not the outward, visible or facial indices, nor the designation, description or nomenclature employed by the Legislature. Such a criterion would emasculate the purpose of the amendment. The whole purpose of the Home Rule Amendment was to vest control of local affairs in local governments, or in the people, to the maximum permissible extent. The sole constitutional test must be whether the legislative enactment, irrespective of its form, is local in effect and application. 528 S.W.2d at 551

We reiterate this correct general statement of the law; however, it must be analyzed in the context of its pronouncement. The "Public Act" in *Farris* was in reality an amendment to a private act and was passed as such because legislative courtesy prevented its adoption as a private act. As we stated, "this was a purely local issue and . . . in reality a general law was used as a device to amend a private act which could not be passed because of a rift in the Shelby County delegation." 528 S.W.2d at 555–56.

Here we deal with a general law of statewide application, containing transitory provisions necessitated because of unique conditions in certain specified counties. *Farris* has no application.

By parity of reasoning, if Article XI, Section 9, precludes the transitional provisions with respect to Knox County on the basis that it is "private or local in form or effect applicable to a particular county," then the entire Act is suspect. This follows from the fact that the provisions are local in effect as to any given county. From this it would follow that the Legislature could not enact a valid law applicable to all municipalities without following Article XI, Section 9, and having referenda, county by county. Such a result would be untenable. This is a general law. The right of the Legislature to provide a basic structure for Tennessee counties is not fairly debatable.

We hold that Section 5–551(b), T.C.A., is constitutional.

### V.

*Appointive Power of the Quarterly Court*

The appeal of the county judge specifies as an issue "whether Article VII, Section 2,

9. The proposal was defeated by a vote of 43,–333 to 39,939.

of the Constitution of Tennessee, removed the appointive power of the quarterly court to fill vacancies in county offices."

Article VII, Section 2, provides, in part, that "[v]acancies in county offices shall be filled by the county legislative body. . . ."

■ This section is non-self-executing and is dependent for its vitality upon the adoption of legislation. Chapter 934, Public Acts of 1978, gave the section vitality; but effective on and after September 1, 1980, when the county legislative body is inducted into office. Until that time the appointive power resides in the quarterly court.

### VI.

#### *Conclusion*

■ The existing government of Knox County continues until August 31, 1980. The three commissioners and the quarterly court remain in office until that time. The county judge remains in office until August 31, 1982, in accordance with the constitutional mandate against diminishing the term of any elected officeholder. His duties, however, from and after September 1, 1980, are wholly judicial. This is the orderly transition prescribed by the General Assembly. The county executive and the members of the county legislative body elected at the general election of 1980 will serve for a period of two years in order to bring Knox County into synchronization with the general statutory scheme.

Reversed.

BROCK, C. J., and FONES, COOPER and HARBISON, JJ., concur.