FOR PUBLICATION

# IN THE SPECIAL SUPREME COURT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| STATE OF TENNESSEE, EX REL., | ) | DAVIDSON EQUITY |
| | ) | Hon. Walter C. Kurtz |
| Appellant, | ) | Chancellor by Interchange |
| | ) | No. 01S01-9605-CH-00106 |
| v. | ) | |
| | ) | |
| BROOK THOMPSON, | ) | |
| State Coordinator of Elections | ) | |
| RILEY DARNELL, | ) | |
| Secretary of State, | ) | |
| CHARLES BURSON, | ) | |
| Attorney General of Tennessee | ) | |
| DON SUNDQUIST, | ) | |
| Governor of the State of Tennessee | ) | |
| and | ) | |
| PENNY WHITE, | ) | |
| Justice of the Supreme Court of Tennessee, | ) | |
| In their respective official capacities, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| STATE OF TENNESSEE EX REL., | ) | DAVIDSON EQUITY |
| LEWIS LASKA | ) | Hon. Irvin H. Kilcrease, Jr. |
| | ) | Chancellor |
| Appellant, | ) | No. 01S01-9605-CH-00106 |
| | ) | |
| BROOK THOMPSON, | ) | |
| Coordinator of Elections, | ) | |
| | ) | |
| | ) | |
| FOR APPELLANT HOOKER | ) | FOR STATE DEFENDANTS |
| John J. Hooker, Pro Se | ) | |
| Robert L. Delaney | ) | Charles W. Burson |
| Nashville | ) | Attorney General & Reporter |
| | ) | |
| FOR APPELLANT LASKA | ) | Andy D. Bennett |
| Bob Lynch, Jr. | ) | Associate Chief Deputy |
| Nashville | ) | |
| | ) | Michael W. Catalano |
| FOR INTERVENOR KING | ) | Associate Solicitor General |
| John K. King, Pro Se | ) | |
| Knoxville | ) | |

FILED

October 2, 1996

Cecil W. Crowson
Appellate Court Clerk

## OPINION

| | |
|---|---|
| TRIAL COURTS AFFIRMED IN PART, REVERSED IN PART AND MODIFIED | BY THE SPECIAL COURT |

These consolidated cases arise from the efforts of appellants, Lewis Laska and John Jay Hooker, to have their names placed on the ballot for the August 1, 1996, statewide election to the office of Supreme Court Justice. The deadline for filing nominating petitions for this election was 12:00 noon on May 16, 1996, in accordance with T.C.A. § 2-5-101.

# I.

## PROCEDURAL BACKGROUND

Prior to the filing deadline, both appellants sought to obtain a nominating petition from Appellee Brook K. Thompson, the State Coordinator of Elections, pursuant to T.C.A. § 2-5-103. Mr. Thompson refused to furnish Appellants Hooker and Laska with a nominating petition. Mr. Thompson informed appellants that pursuant to T.C.A. § 17-4-101, *et seq.* (popularly known as the "Tennessee Plan"), Justice Penny J. White[1] would be running unopposed on the ballot in a "retention election," whereby hers would be the only name on the ballot and the public would be given the opportunity to vote "yes" or "no" as to whether she should be retained as a Supreme Court Justice.

On May 13, 1996, Mr. Laska sought injunctive relief in the United States District Court for the Middle District of Tennessee, *Lewis Laska v. Brook Thompson*, Docket No. 3:96-0441, requesting the federal court to order Defendant/Appellee Thompson to furnish him with a nominating petition.[2] United States District Court Judge Thomas A. Higgins issued an order on May 16, 1996, dismissing the lawsuit.[3] On May 16, 1996, upon learning that his federal court action had been dismissed,

---

[1]Justice White was appointed December 17, 1994, by then Governor Ned McWherter to fill the unexpired term of Justice O'Brien, an "at large" Supreme Court judge who resided in the Eastern Grand Division of Tennessee.

[2]Federal jurisdiction was invoked pursuant to 42 U.S.C. §§ 1983 and 1971(b), as well as the First and Fourteenth Amendments of the United States Constitution.

[3]The action was dismissed by Judge Higgins on the basis of the abstention doctrine, which requires that federal courts give deference to state courts in matters of state law.

Mr. Laska attempted to intervene in a similar case which had been filed on May 15 by Mr. Hooker in the Chancery Court for Davidson County, Tennessee, *State ex rel. John Jay Hooker v. Brook Thompson, in his Capacity as Coordinator of the Division of Elections, Office of the Secretary of State, et al.*, Docket No. 96-1519. Mr. Hooker had filed a *pro se* Petition for Mandamus, seeking to have the Chancellor issue a writ of mandamus ordering the issuance to him "and all others similarly situated" of a nominating petition for the office of Supreme Court Justice. In his request for relief, Mr. Hooker also requested "such other relief as the court deems just and equitable, including adjudication that said statutes 17-4-101, et seq. are unconstitutional under both the U.S. and Tenn. Consts. [sic]." On May 16, 1996, Circuit Court Judge Walter Kurtz, sitting as Chancellor by interchange, issued an order denying Mr. Hooker's Petition for Writ of Mandamus on grounds that Mr. Hooker lacked standing to bring the action.[4] Mr. Laska's Motion to Intervene was not addressed in that order.

On May 22, 1996, Appellant Laska filed a separate lawsuit in Chancery Court for Davidson County, *State of Tennessee ex rel. Lewis Laska v. Brook Thompson, in his Official Capacity as Coordinator of the Division of Elections, et al.,* Docket No. 96-1585, seeking a writ of mandamus, as well as declaratory and injunctive relief. By Memorandum and Order entered on May 31, 1996, Chancellor Irvin H. Kilcrease dismissed Mr. Laska's action, holding that Justice White was correctly on the ballot in a "yes/no" retention election under the Tennessee Plan.[5] Following a series of

_____

[4]The basis for this ruling was two-fold: (1) Mr. Hooker was, at the time he sought to qualify as a candidate, a resident of the Middle Grand Division and therefore under T.C.A. § 16-3-101(a) could not qualify, because that statute prohibits more than two Justices from any one grand division of the state, and there are already in office two Justices who are residents of the Middle Grand Division, Justice A. A. Birch, Jr. and Justice Frank Drowota; and (2) Mr. Hooker's law license had been suspended because of his failure to meet continuing legal education requirements, resulting in his failure to meet the requirements of T.C.A. §§ 2-5-106 and 17-1-106 that a Supreme Court Justice be an attorney licensed to practice in Tennessee.

[5]Chancellor Kilcrease held that the "... judicial evaluation program applies only to judges who are candidates for full eight [year] terms beginning September 1, 1998. Therefore, the judicial evaluation program does not apply to the candidacy of Justice White, who is a candidate for the remainder of an unexpired term." The Chancellor also found that Mr. Laska's argument that the Tennessee Plan, T.C.A. § 17-4-101, *et seq.*, unconstitutionally deprives the public of their right to a "free and equal election" pursuant to Article I, Section 5

appellate maneuverings, these cases came before the Supreme Court. On June 26, 1996, all sitting Justices on the Tennessee Supreme Court disqualified themselves from further proceedings in these cases.[6]

On July 2, 1996, this Special Supreme Court was sworn in by Justice A. A. Birch, Jr., Chief Justice of the regularly constituted Tennessee Supreme Court. Given the impending election date of August 1, 1996, and the fact that these matters had been pending in the Tennessee court system since mid-May of this year, this Court commenced deliberations immediately after the oath of office. On July 2, 1996, this Court entered Orders assuming jurisdiction of these matters under T.C.A. § 16-3-201(d) to bypass the Court of Appeals, finding that these cases are of unusual public importance in which there is special need for expedited decision and which involve the right to hold or retain public office and issues of constitutional law.

Following oral argument,[7] in an attempt to salvage the validity of the August 1, 1996, election, this Court issued a series of Orders on an expedited basis in these consolidated cases, while noting that a more detailed Opinion would follow in due course. On July 5, 1996, this Court ordered that Appellant Hooker could not be placed upon the ballot because he failed to meet the requirement that a candidate for Supreme Court Justice must be an attorney licensed to practice law in Tennessee, remanded Appellant Laska's case to the Chancellor for a ruling as to whether he was, as he claimed, a bona fide resident of the Western Grand

---

of the Tennessee Constitution was "without merit." Given his dismissal of the case on other grounds, the Chancellor found it unnecessary to determine the issue of Mr. Laska's legal residence or his failure to timely file his nominating petition.

[6]Effectively, the Supreme Court Justices recused themselves because these matters involve the manner in which they are elected. Under Article VI, Section 11 of the Tennessee Constitution, and T.C.A. § 17-2-102, sitting judges are required to certify their disqualification to the Governor, "... and he shall forthwith specially commission the requisite number" to hear and determine the matters. Governor Sundquist appointed this panel to hear and determine these cases.

[7]With the permission of this Court, Attorney John K. King was allowed to file an *amicus curiae* brief on July 5, the day of the hearing. In that brief, Mr. King contended that the Tennessee Plan violates Article VI, Section 3 of the Tennessee Constitution, which requires that "[t]he Judges of the Supreme Court shall be elected by the qualified voters of the State."

Division and ordered the Chancellor to issue a writ of mandamus forthwith if he found that Mr. Laska was a bona fide resident of the Western Grand Division. This Court also ordered on July 5 that as an equitable matter, Justice White should be deemed to have filed a qualifying petition for her office. On July 8, 1996, this Court vacated the portion of its July 5 order remanding Appellant Laska's case back to the Chancellor, on the ground that T.C.A. § 17-1-301(b) requires that the vacancy for which Justice White was running must be filled from the same grand division of the state in which the vacancy had occurred, that being the Eastern Grand Division; inasmuch as Mr. Laska had made no claim to be a resident of the Eastern Grand Division, this Court ordered that his name could not be placed on the ballot.[8] On July 8, 1996, John King, the putative Republican candidate for the office held by Justice White, filed an *amicus curiae* brief contending that he should be entitled to equitable relief similar to that granted Justice White, in the form of an extension of the qualifying deadline. Upon due consideration of Mr. King's contentions, on July 9, 1996, this Court ordered the equitable relief of extending the deadline for all candidates for the Eastern Grand Division Supreme Court vacancy from May 16, 1996, to 4:00 p.m., July 12, 1996. The Attorney General filed a Motion for Clarification, seeking clarification as to whether the equitable relief granted in this Court's Order of July 8, 1996, extended to intermediate appellate judges, who were not parties to these consolidated cases. The Court entered an Order on July 10, 1996, limiting the equitable relief to these cases *sub judice,* for which this Special Supreme Court was commissioned.[9]

The following is this Court's opinion explaining the legal basis for its Orders in upholding the constitutionality of the Tennessee Plan of judicial selection, while holding that the Plan is not applicable to the August 1, 1996, Supreme Court election and granting the equitable relief of extending the qualifying and nominating deadlines for the August 1, 1996, election for office of Supreme Court Judge.

---

[8]See Section V and VI, *infra*, regarding residency requirements.

[9]Courts do not expressly adjudicate the rights of persons who are not parties to the litigation.

## II.

## *CONSTITUTIONALITY OF THE TENNESSEE PLAN*

In the consolidated appeals before the Court, both appellants and *amicus curiae* John King have attacked the validity of T.C.A. § 17-4-101, *et seq.* (the "Tennessee Plan" of appellate judicial selection) as unconstitutional under various provision of the Constitution of Tennessee, specifically Article I, Sections 1, 4 and 5,[10] Article II, Section 1,[11] Article VI, Section 3,[12] and Article XI, Section 16.[13]

_____

[10]Article I, Declaration of rights, provides in pertinent part:
*Section I. All power inherent in the people - Government under their control.* - That all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness; for the advancement of those ends they have at all times, an unalienable and indefeasible right to alter, reform, or abolish the government in such manner as they may think proper.
*Section 4. No religious or political test.* - That no political or religious test, other than an oath to support the Constitution of the United States and of this State, shall ever be required as a qualification to any office or public trust under this State.
*Section 5. Elections to be free and equal - Right of suffrage.* - The elections shall be free and equal, and the right of suffrage, as hereinafter declared, shall never be denied to any person entitled thereto, except upon conviction by a jury of some infamous crime, previously ascertained and declared by law, and judgment thereon by court of competent jurisdiction.

[11]Article II, Distribution of Powers, provides at Section 1:
*Section 1. Division of powers.* - The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial.

[12]Article VI, Judicial Department, provides at Section 3:
*Section 3. Supreme court judges* - The Judges of the Supreme Court shall be elected by the qualified voters of the State. The Legislature shall have power to prescribe such rules as may be necessary to carry out the provisions of section two of this article. Every Judge of the Supreme Court shall be thirty-five years of age, and shall before his election have been a resident of the State for five years. His term of service shall be eight years.
Section 2 of Article VI deals with the composition of the Supreme Court, providing:
*Section 2. Supreme Court.* - The Supreme Court shall consist of five Judges, of whom not more than two shall reside in any one of the grand divisions of the State. The Judges shall designate one of their own number who shall preside as Chief Justice. The concurrence of three of the Judges shall in every case be necessary to a decision. The jurisdiction of this Court shall be appellate only, under such restrictions and regulations as may from time to time be prescribed by law; but in may possess such other jurisdiction as is now conferred by law on the present Supreme Court. Said Court shall be held at Knoxville, Nashville and Jackson.

[13]Article XI, Miscellaneous Provisions, states at Section 16:
*Section 16. Bill of rights to remain inviolate.* - The declaration of rights hereto prefixed is declared to a part of the Constitution of this State, and shall never be violated on any pretence whatever. And to guard against transgression of the high powers we have delegated, we declare that everything in the bill of rights contained, is excepted out of the General powers of government, and shall

Appellant Hooker has also claimed that the Tennessee Plan violates his rights under the 14th Amendment to the United States Constitution.

At the outset, we note that laws enacted by the legislature are entitled to a presumption of constitutionality; *see, e.g., State ex rel. Maner v. Leech,* 588 S.W. 2d 534, 540 (Tenn. 1979). This Court dismisses as without merit, and irrelevant to these cases, appellants' contentions that the Tennessee Plan of appellate judicial selection violates any of the following provisions of the Constitution of Tennessee: Article I, Sections 1 ("All power inherent in the people - Government under their control - ") and 4 ("No religious or political test -") and Article XI, Section 16 ("Bill of rights to remain inviolate -"). However, Appellants' arguments regarding Article I, Section 5 ("Elections to be free and equal - Right of suffrage"); Article II, Section 1("Division of powers"), and Article VI, Section 3 ("Supreme court judges" to be elected by the qualified voters of this State) raise substantial constitutional issues and bear further analysis and discussion.

The gravamen of appellants' position is that a "retention election," as contemplated under the Tennessee Plan, is not a "free and equal" election and deprives the qualified voters of this state of the opportunity to elect Supreme Court judges. The issue of whether yes/no retention elections violate the Constitution of Tennessee has previously been decided by the Tennessee Supreme Court in the case of *State ex rel. Higgins v. Dunn*, 496 S.W. 2d 480 (Tenn. 1973), and no compelling reason has been given to persuade this Court that it should disturb that ruling. The *Higgins* opinion specifically dealt with the issue of whether a "retention election" involving only a yes/no vote is the type of election that is contemplated in Article VI, Section 3 of the Tennessee Constitution, answering that question in the affirmative. The *Higgins* Court noted:

> The Constitution of Tennessee does not define the words, "elect", "election", or "elected" and we have not found nor have we been referred to any provision of the Constitution or of a statute or to any decision of one or our appellate courts defining these words. *Id.* at 489.

forever remain inviolate.

7

In the absence of a definition of "election" to the contrary, the *Higgins* Court then cited a number of instances in which the Tennessee Constitution provides for referenda and refers to them as "elections." Thus, the Court reasoned:

> It seems to us that if the Constitution itself denominates these methods of ratification as elections, it cannot be that Chapter 198 is unconstitutional because the elections therein provided are limited to approval or disapproval. So are the elections provided in Sections of the Constitution referred to above. *Id.* at 489.

Although the dissent of Justice Humphreys makes a number of good points, this Court concludes that it must follow the majority in *Higgins.* To rule the meaning of the term "election" as used in the Tennessee Constitution is limited to the popular concept of an election (i.e., a choice among one or more candidates in which the candidate with the most votes wins the office), would be to hold, in effect, that the Tennessee Constitution uses an internally inconsistent definition of "election." This conclusion is further dictated by the fact that the framers specifically provided for a choice among candidates for the election of the Governor; Article III, Section 2 provides:

> The Governor shall be chosen by the electors of the members of the General Assembly, at the time and places where they shall respectively vote for the members thereof... The person having the highest number of votes shall be Governor; but if two or more shall be equal and highest in votes, one of them shall be chosen Governor by joint vote of both Houses of the General Assembly.

Thus, it being the duty of this Court, if there is a doubt as to the meaning of the Constitution or a seeming conflict, "...to harmonize such portions and favor the construction which will render every word operative...," *Shelby County v. Hale*, 200 Tenn. 503, 292 S.W. 2d 745 (1956), this Court holds that the yes/no retention vote provided for in the Tennessee Plan is in compliance with the Article VI, Section 3 mandate of the Tennessee Constitution that Judges of the Supreme Court be "elected by the qualified voters." No authority was cited by any party to these proceedings, nor has any been found by this Court, that would dictate a different result under the United Stated Constitution.[14] It follows that Appellants' contention

---

[14] *See, e.g., Selection and Retention of Judges: Is Florida's Present System Still the Best Compromise?,* 49 U. Miami L. Rev. 1 (Fall 1994) for a summary of the adoption of yes/no retention election for judges in other jurisdictions.

that the Tennessee Plan violates Article I, Section 5 of the Tennessee Constitution requiring that "...elections shall be free and equal" is also without merit, since the constitutional definition of "election" in this state encompasses the yes/no retention vote and it has previously been held that the "free and equal" requirement relates only to the rights of suffrage and not the nature of elections. *Compare, Bemis Pentecostal Church v. State,* 731 S.W. 2d 897, at 901 (Tenn. 1987), cert. denied, 485 U.S. 930, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988).

With respect to Appellants' argument that the Tennessee Plan violates the separation of powers provision of Article II, Section 1 of the Tennessee Constitution, we hold that it does not. Recognizing that the doctrine of separation of powers "is a fundamental principle of American constitutional government," *Underwood v. State,* 529 S.W. 2d 45, 7 (Tenn. 1975) and that "a judge must be secured against the political caprice of other departments of government," *Summers v. Thompson* 764 S.W. 2d 182 (Tenn. 1988), *Drowota concurring opinion* at 190, this Court acknowledges that Justice Humphreys in his dissent in *Higgins* postulates the potential for legislative action that could violate the independence of the judiciary.[15] We hold, however, that the Tennessee Plan which provides for a yes/no retention vote based on a majority vote does not cross that threshold.

Having found the Tennessee Plan is constitutional, we turn to its interpretation as applied to the factual situations in these consolidated cases.

### III.

### THE TENNESSEE PLAN AS APPLIED TO THE AUGUST 1, 1996 ELECTION FOR SUPREME COURT JUSTICE

Given our decision that the Tennessee Plan is constitutional, the central question in these cases is whether the State Coordinator of Elections acted in violation of the statute when he refused to issue nominating petitions to Appellants Hooker and Laska and others similarly situated, based on his belief that Justice

---

[15]Justice Humphreys' rather disturbing suggestion that the Legislature could provide that "a judge must be approved by an affirmative vote of such a percentage as will empty the Bench of presently serving judges," *Higgins* at 494, would present a far different case than that presently before this Court.

White was entitled to be the only candidate on the ballot for her seat on the Supreme Court. We conclude that the statute was violated.

The Legislature adopted the Tennessee Plan in 1994 to

> ...assist the governor in finding and appointing the best qualified persons available for service on the appellate courts of Tennessee, and to assist the electorate of Tennessee to elect the best qualified persons to the courts; to insulate the judges of the courts from political influence and pressure; to improve the administration of justice; to enhance the prestige of and respect for the courts by eliminating the necessity of political activities by appellate justices and judges, and to make the courts "nonpolitical."

T.C.A. § 17-4-101. These are laudable goals and much has been written about the superiority of a judiciary selected on the basis of merit and elected under "retention elections" over popularly elected judges.[16]

The question before this Court is whether or not Justice Penny White was entitled to be on the ballot for a yes/no retention vote on August 1, 1996, in the absence of a favorable judicial evaluation. In analyzing the Tennessee Plan's statutory scheme, we first note that the Tennessee Supreme Court judges may be up for election either for a full eight-year term pursuant to Article VI, Section 3 of the Tennessee Constitution or, if the judge has been appointed to fill a vacancy on the Court, the judge must be elected to fill the unexpired eight-year term of the judge who vacated the bench and the election must be held at the next regular biennial August election. Article VII, Section 5 of the Tennessee Constitution. The 1994 Tennessee Plan addresses each of these situations separately.

With respect to judges seeking election to a full eight-year term, T.C.A. § 17-4-115 provides that any judge seeking to be elected for a full term[17] may qualify to run on a yes/no retention ballot. However, § 17-4-115(c) unequivocally states:

> (c)    Unless the judicial evaluation commission recommends the retention of a judge, the provisions of this part shall not be applicable. A political party may nominate a candidate and independent candidates may qualify under the general election law for the general

---

[16]*See, e.g.,* Watson*, Judicial Selection: What Fits Texas? Observations on the Missouri Nonpartisan Court Plan*, 40 S.W. L. J. 1 (May 1986); *Selection and Retention of Judges: Is Florida's Present System Still the Best Compromise?*, 49 U. Miami L. Rev. 1 (Fall 1994).

[17]All supreme court terms are concurrent and the next election year for a full term is 1998, pursuant to the Constitution, Article VI, Section 3 and Article VII, Section 5.

election which shall be the regular August election. After a judge is elected under this subsection the provisions of this chapter concerning the evaluation and retention process shall again apply.

With respect to judges seeking to fill an unexpired term, T.C.A. § 17-4-114 makes the yes/no retention vote applicable under the Tennessee Plan, and T.C.A. § 17-4-114(c) also unequivocally states:

(c)  Unless the judicial evaluation commission recommends the retention of a judge, the provisions of this act shall not be applicable. A political party may nominate a candidate and independent candidates may qualify under the general election law for the general election which shall be the regular August election. After a judge is elected under this subsection, the provisions of this chapter concerning the evaluation and retention process shall again apply.

Thus, both statutes setting up the right to be elected under a yes/no retention vote, T.C.A. § 17-4-115 and § 17-4-114, , using identical language, predicate a judge's right to run on the yes/no ballot upon the recommendation of retention of that judge by the judicial evaluation commission.

The establishment of the judicial evaluation commission is set out in T.C.A. § 17-4-201; this commission is required to be established by July 1, 1995. By the terms of § 17-4-201(e), "[t]he judicial evaluation program, including the public report and the ballot information, shall apply to each appellate court judge who seeks to serve a complete term after September 1, 1994."[18]

The impact of T.C.A. § 17-4-201(e) on the election of Justice White is at the heart of the controversy before this Court. The state defendants argue that this language means that no judicial evaluations were required for any judge until the full term elections in 1998; the appellants argue that this provision does not act to exempt judges seeking to fill unexpired terms pursuant to T.C.A. § 17-4-114 from the evaluation if they wish to run on a yes/no retention ballot prior to the 1998 elections. At oral argument on July 5th, counsel for the state defendants admitted that they had reviewed the legislative history of the Tennessee Plan and had found

---

[18]Supreme Court Rule 27, entitled Judicial Performance and Evaluation Program, adopted June 16, 1995, refers to appellate judges seeking, "election or re-election to a full eight (8) year term", five times. No mention is made of elections to fill an unexpired term. The implication follows that the Court interprets the act to apply only to elections to fill a full eight (8) year term. We disagree.

no legislative history supportive of the state's position. There is no dispute that the judicial evaluation commission did not evaluate Justice White, apparently believing that it was not required to perform any judicial evaluations until the 1998 elections.

The Tennessee Supreme Court has previously articulated the guidelines for this Court's role in statutory interpretation. As succinctly stated in *Crowe v. Ferguson*, 814 S.W. 2d 721, 723 (Tenn. 1991):

> . . . the cardinal rule of Tennessee statutory interpretation is to ascertain and give effect to the intent and purpose of the Legislature in relation to the subject matter of the legislation, all rules of construction being but aids to that end . . . . A statute must be construed so as to ascertain and give effect to the intent and purpose of the legislation, considering the statute as a whole and giving words their common and ordinary meaning. The Court should assume that the Legislature used each word in the statute purposely and that the use of these words conveyed some intent and had a meaning and purpose. [citations omitted]

The intent and purpose of the Tennessee Plan having been explicitly stated to be to enhance the prestige of the Courts by eliminating the necessity for political activities by appellate judges while assisting the electorate with the election of the best qualified persons to the judiciary, the evaluation process is clearly an integral part of the statutory scheme. To a large degree, the evaluation commission takes the place of the political arena to provide the voters of Tennessee with a basis for casting an informed ballot. Considering the Tennessee Plan as a whole and giving the words therein their common and ordinary meaning, the conclusion is inescapable that T.C.A. § 17-4-114(c) means exactly what it says: unless the judicial evaluation commission acts to recommend the retention of a judge running to fill an unexpired term of that judge's predecessor, the provisions of the Tennessee Plan for a yes/no retention vote do not apply, opening the race to the regular election laws; political parties may nominate candidates and independent candidates may qualify under the general election law. Assuming, as we must, that the Legislature used each word in the statute purposely and that the use of these words conveyed some intent, we cannot ignore the plain meaning of T.C.A. § 17-4-114(c).

In the absence of any clear indication to the contrary, this Court is persuaded that the Legislature used each word in the statute purposely and that the use of

12

these words conveyed some intent and had a meaning and purpose. Appellees have argued that the provisions of T.C.A. § 17-4-201(e) make it clear that the judicial evaluation program was intended to apply *only* to appellate court judges seeking to serve a complete term after September 1, 1994. This Court does not read the statute to convey that meaning, based on its plain language. Nowhere in the statutory scheme of the Tennessee Plan does the Legislature state that the judicial evaluation procedures shall not apply to the August 1, 1996 election. Indeed, the legislation specifically states that the Supreme Court is required to implement the judicial evaluation program after September 1, 1994, but before July 1, 1995, or the entire Tennessee Plan will be void. Accordingly, there was sufficient time allowed by the Legislature for evaluation and publication of a report and retention recommendation 180 days before May 16, 1996, assuming only that the judge to be elected had been appointed sufficiently in advance of the election. T.C.A. § 17-4-201(c) makes the evaluation program mandatory for each judge seeking a complete term after September 1, 1994; there is no similar provision with respect to judges seeking to fill an unexpired term. This makes sense in the overall statutory scheme of the Tennessee Plan, because the timing of a judicial appointment to an unexpired term might not allow sufficient time to conduct the full evaluation process, in which event § 17-4-114(c) dictates that the yes/no retention vote is not applicable.[19]

Given the stated purpose of the Legislature to "assist the electorate of Tennessee to elect the best qualified persons," as set forth in T.C.A. § 17-4-101(a), and the stated purpose of the judicial evaluation program ". . . to aid the public in evaluating the performance" of appellate judges, this Court does not find it inconsistent with the intent of the Legislature in enacting the Tennessee Plan to require that a judge be evaluated and recommended for retention in order to run in a "yes/no retention election" in 1996. The Plan specifically states at T.C.A. § 17-4-114 that the provisions of the Plan shall *not* be applicable "unless the judicial

---

[19]The possibility that a judge could be seeking a complete term, when that judge had not been appointed sufficiently in advance of the election to allow time for evaluation, is seemingly ignored by the statute.

13

evaluation commission recommends the retention of a judge" and further provides that when the Plan is not applicable, "[a] political party may nominate a candidate and independent candidates may qualify under the general election law for the general election which shall be the regular August election." Plainly stated, where the Plan does not function to have a well-informed commission advise the public about how they should vote, the concept of a retention election is thrown out. We find that this is consistent with the overall intent and scheme of the Tennessee Plan.

Having found that the provisions of the Tennessee Plan do not apply to the Supreme Court election of August 1, 1996, this Court was faced with the fact that no one had properly qualified under the general election laws to run for the unexpired term of Justice O'Brien, filled in the interim by Justice White. As noted previously, the deadline for so qualifying was May 16, 1996 pursuant to T.C.A. § 2-5-101(a)(2).

## IV.

### EQUITABLE RELIEF FROM THE QUALIFYING DEADLINE

This Court has broad equitable powers, and there is ample precedent for extending the qualifying deadline. As noted by the Supreme Court in *Crowe v. Ferguson*, 814 S.W. 2d 721, at 725, ". . . if a candidate misses a qualifying deadline due to her reasonable and justifiable reliance upon an official opinion, relief from the mandatory deadline is appropriate, provided filing takes place with all reasonable dispatch after it is discovered that the opinion is incorrect." The facts in the *Crowe* case are similar to the case at bar: a person interested in running for office was misled by election officials as to whether she was eligible to file a qualifying petition. Relying on the precedent of *Koella v. State ex rel. Moffett*, 218 Tenn. 629, 405 S.W. 2d 184 (Tenn. 1966), the Supreme Court ruled that the candidate in question, who filed after the qualifying deadline, was properly placed on the ballot.

Accordingly, we ruled as a matter of equity that Justice White's name should be placed on the ballot as if she had properly qualified. Based on briefs filed subsequent to our initial ruling granting this equitable relief to Justice White, this

14

Court also ruled that equitable relief should be granted to all candidates similarly misled, and therefore extended the qualifying deadline for the August 1, 1996 election for the seat on the Supreme Court at issue until 4:00 p.m., July 12, 1996. As previously noted in our Order of July 9, in accordance with T.C.A. § 17-1-301, candidates for the unexpired term of Justice O'Brien, who resided in the Eastern Grand Division of Tennessee, must be residents of the Eastern Grand Division.

## V.

### THE RESIDENCY REQUIREMENT TO FILL A VACANCY FOR AN UNEXPIRED TERM OF A SUPREME COURT JUDGE WHO RESIGNS

The Tennessee Constitution provides limited constitutional mandates with respect to residency requirements of Supreme Court judges in this State. Article VI, Section 2 provides in pertinent part:

> The Supreme Court shall consist of five Judges, of whom not more than two shall reside in any one of the grand divisions of the State.

Article VI, Section 3, provides as follows:

> The Judges of the Supreme Court shall be elected by the qualified voters of the State. The Legislature shall have power to prescribe such rules as may be necessary to carry out the provisions of section two of this article. Every Judge of the Supreme Court shall be thirty-five years of age, and shall before his election have been a resident of the State for five years. His term of service shall be eight years.

The Tennessee legislature has enacted laws declaring that there are three grand divisions of the State: the Eastern, Middle, and Western, and has specified the counties of which each grand division is comprised. T.C.A. §§ 4-1-201 - 4-1-204. In response to the mandates of Article VI of the Tennessee Constitution, the legislature enacted T.C.A. § 16-3-101 regarding the composition of the Supreme Court:

> Composition -- Election of judges -- Qualifications - Concurrence necessary for decisions. -- (a) The supreme court shall consist of five (5) judges, one (1) of whom shall reside in each grand division, and not more than two (2) in the same grand division.
>
> (b)     Judges of the supreme court shall be elected as follows: one (1) of the supreme court judges shall be elected from each of the three (3) grand divisions and two (2) of the supreme court judges shall be elected from the state at large. Each candidate shall reside in the grand division for which the candidate is elected and the two candidates elected for the state at large shall not reside in the same

15

grand division.

(c)    Each judge shall be thirty-five (35) years of age and shall, before election, have been a resident of the state for five (5) years.

(d)    A judge's term of office shall be eight (8) years.

(e)    The concurrence of three (3) of the judges is necessary to a decision in every case.

Both Article VI, Section 3 of the Constitution and the statutory scheme enacted under its mandate make it clear that a "term of office" is eight years for judges on the Supreme Court of this state.

The sitting members of the Supreme Court and the positions they held when these cases were presented were as follows:  Justice Lyle Reid, Western Division; Justice A. A. Birch, Jr., Middle Division; Justice E. Riley Anderson, Eastern Division; Justice Frank F. Drowota, III, State at Large (residing in the Middle Division); and Justice Penny J. White, State at Large (residing in the Eastern Division).

The position on the bench at issue in these lawsuits, being the seat held by Justice White, is an "at large" position.  In August 1990, Justice Charles O'Brien was elected to a full eight-year term as an "at large" judge residing in the Eastern Grand Division.  He resigned in October, 1994.  Pursuant to the selection procedure of the Tennessee Plan, Justice Penny White, also a resident of the Eastern Grand Division, was appointed December 17, 1994, to fill a portion of Justice O'Brien's unexpired term, to wit, until August 31, 1996.  T.C.A. §§ 17-4-109; 17-4-112.  The last sentence of Article VII, Section 5 of the Tennessee Constitution requires that the remaining two years of the unexpired portion of Justice O'Brien's eight-year term "be filled at the next biennial election recurring more than thirty days after the vacancy occurs."  The next biennial election after Justice O'Brien's resignation creating the vacancy in his unexpired eight-year term was the election held on August 1, 1996.

Our ruling that the vacancy created by Justice O'Brien's resignation must be filled from the Eastern Grand Division is based on T.C.A. § 17-1-301, which reads in pertinent part:

Vacancies in office. -- (a) Whenever a vacancy, either by death,

16

resignation, or removal, shall occur in the office of a judge of the supreme court . . . the vacancy in such office shall be filled by the qualified voters of the whole state for judges of the supreme court . . . at the next biennial election in August, occurring more than thirty (30) days after such vacancy, and in the meantime, the governor shall appoint a person learned in the law and constitutionally qualified to discharge the duties of such office until such election can be had.

(b)     If a vacancy shall occur in the office of a judge of the supreme court . . . it shall be filled from the grand division of the state in which the vacancy occurs.

It is noteworthy that this requirement is echoed in T.C.A. § 8-48-109, which provides:

Judicial vacancies filled from same grand division. -- Any vacancy in the office of supreme court or appeals court judge shall be filled by a person residing in the grand division of the state in which the vacancy occurs.

Appellant Laska relied on an opinion of the Attorney General (AG No. 80-153, June 20, 1980) in asserting that he was qualified as a resident of the Western Grand Division of Tennessee to run for the office vacated by Justice O'Brien and filled in the interim by Justice White. This opinion held that a vacancy created by the death of Justice Joe Henry, an "at large" justice residing in the Middle Grand Division, could be filled from either the Middle Grand Division or the Western Grand Division where only one member of the court resided. After noting the relevance of T.C.A. § 17-1-301,[20] the opinion ignored the limitation in that statute to the division in which the vacancy occurred. The Attorney General's analysis pointed out in detail that filling the vacancy would not violate Article VI, Section 2 of the state constitution but offered no reason for failing to apply the residency limitation adopted by the Legislature in T.C.A. § 17-1-301(b).

Without violating the constitutional residency requirement, the Legislature could easily have enacted a provision that a vacancy on the Supreme Court bench could be filled from either one of the two grand divisions of the state having only one current member, but it did not do so. Instead, it expressly provided that the vacancy be filled "from the grand division of the state in which the vacancy occurs." That limitation is not in conflict with the constitutional residency requirement and is clearly within the power of the Legislature in implementing the judicial article of the

---

[20]In 1980, this section was codified as T.C.A. § 17-112.

constitution. See *State ex rel. Cole v. City of Hendersonville*, 223 Tenn. 365, 445 S.W. 2d 652, at 656 (1969). It is relevant to note that, in order to comply with the constitutional residency requirement, a vacancy created by the resignation of a justice holding any of the three grand division seats must be filled by a resident of the same grand division in which the vacancy occurs. There may well be good reason for the two "at large" positions to remain in the same two grand divisions for the remainder of the eight-year term the people elected them to occupy. But good or bad, it is the law, and cannot be ignored by the courts of this state or the Attorney General.

Appellant Laska asserts that this special court's interpretation of T.C.A. § 17-1-301 will result in "freezing" the at large seats on the Supreme Court in Middle and East Tennessee. Our interpretation is that the two statutes limiting residency to the grand division where the vacancy occurs, T.C.A. §§ 8-48-109 and 17-1-301 apply only to biennial elections to fill unexpired terms. A vacancy created by the rejection of an incumbent justice seeking a full eight year term can be filled from one of two grand divisions, subject to the residency requirements of Article VI, Section 2, Tennessee Constitution - the division wherein the rejected judge resides or the grand division where only one judge resides.

The result articulated in the 1980 opinion of the Office of the Attorney General is clearly erroneous. The unequivocal mandate of the Legislature expressed in T.C.A. § 17-1-301(b), as well as T.C.A. § 8-48-109, governs the residency requirement for those who would seek to fill the unexpired term resulting from the death, resignation or removal of a Supreme Court Justice, whether the vacating justice holds a grand division position or a state at large position. There are statutorily only three grand divisions in this state; there is no "at large" grand division, and a judge vacating his or her office is necessarily a resident of one of the three grand divisions of the state. Thus, a vacancy in one of the "at large" positions for an unexpired term must be filled by a resident of the grand division in which the vacancy occurs, which is that in which the "at large" judge resides.

## VI.

### *CONSIDERATION OF POST JUDGMENT FACTS*

We take judicial notice that following the issuance of our orders in these cases something approaching legal chaos ensued. Appellant Hooker sued this Court in the United States District Court for the Middle District of Tennessee. Justice White joined other appellate judges in seeking and obtaining a ruling from Judge Bernice Donald, United States Judge for the Western District of Tennessee, that required that the judges be placed on the ballot for retention election. The retention election was held on August 1, 1996, and Justice White was voted out of office. On September 9, 1996, the Attorney General's Office issued its Opinion No. 96-117 holding that the vacancy in the unexpired term of Justice O'Brien could be filled by a resident of either the Eastern or Western Grand Division of the state. In that Opinion, the Attorney General distinguished the post-election situation from the issue which this Special Supreme Court dealt with by asserting, *ipsi dixit*, that the vacancy on the Supreme Court bench was not created by Justice O'Brien's resignation, but by Justice White's failure to receive a majority of votes for retention in the August 1, 1996 election.

Rule 14, Tennessee Rules of Appellate Procedure, grants power to the appellate courts to consider post-judgment facts "capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as . . . . other judgments or proceedings . . . ." An appellate court may act on its own motion. We believe that the Attorney General Opinion No. 96-117 affects the subject matter of this action and that its validity should be considered by this Court.

As noted previously, the Tennessee Constitutional mandate for filling vacancies for unexpired terms on the Supreme Court is the last sentence of Article VII, Section 5, of the Constitution of Tennessee which provides as follows:

> No special election shall be held to fill a vacancy in the office of Judge or District Attorney, but at the time herein fixed for the biennial election of civil officers; and such vacancy shall be filled at the next Biennial [sic] election recurring more than thirty days after the vacancy occurs.

This mandate that Supreme Court vacancies be filled at the biennial election

recurring more than thirty days after the vacancy occurs, requires a two-step process to fill a vacancy: (1) the vacancy is first filled until the biennial election; (2) a judge is elected at the biennial election to fulfill the unexpired term. The Legislature implemented Article VII, Section 5, by enacting T.C.A. § 17-1-301, providing, in part, that the Governor appoint a qualified person, "until such election can be held." That appointment expires on August 31 of the biennial election year and the vacancy is filled by the biennial election for the period from September 1 of the biennial election year to the end of the full eight-year term of the justice who has created the vacancy. *Compare*, *State ex rel. Higgins v. Dunn, supra*, at 491.

The vacancy that was on the ballot to be filled in the August 1, 1996 biennial election was the unexpired term of Justice O'Brien. The premise of the Attorney General's Opinion that the vacancy to be filled now is that of Justice White is that a new vacancy was created by the rejection of a justice who had no unexpired term to be filled. That position ignores Article VII, Section 5, of the Tennessee Constitution and is facially untenable.

Nothing in the Tennessee Plan indicates that it was intended to override T.C.A. § 17-1-301(b). Therefore, we hold that Attorney General Opinion No. 96-117 is erroneous; the requirements of T.C.A. § 17-1-301(b) and T.C.A. § 8-48-109 must be followed; and the "at large" vacancy created by the resignation of Justice O'Brien must be filled by a resident of the Eastern Grand Division, the grand division in which the vacancy originally occurred.

All motions and petitions filed since July 5, 1996, not heretofore or herein ruled upon, have been considered by the Court, found to be without merit or not within the scope of this special courts commission, and are denied.

Costs are adjudged as follows: John King and each intervenor shall pay the costs resulting from their respective filings. The remaining costs shall be assessed one-fourth to Appellant Hooker, one-fourth to Appellant Laska and one-half to the state defendants.

20

ENTERED this the _____ day of October, 1996.


_____
                          William H. D. Fones, Chief Justice


_____
                          Martha S. L. Black, Justice


_____
                          S. Morris Hadden, Justice


_____
                          Lin S. Howard, Justice


_____
                          A. C. Wharton, Jr., Justice