# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 19, 2025 Session

## METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY ET AL. v. BILL LEE ET AL.

**Appeal from the Chancery Court for Davidson County**
No. 23-0336-I, 23-0395-III     Patricia Head Moskal, Chancellor

———————————————————

### No. M2024-01182-COA-R3-CV

———————————————————

A three-judge panel was convened in this case to determine the constitutionality of 2023 Tennessee Public Chapter 21. While the case was pending, the trial court temporarily stayed implementation of subsection 1(b) of the legislation, the result of which was that the deadlines contained therein were rendered moot. In considering competing summary judgment motions, the trial court unanimously ruled that subsection 1(a) of the act was not also moot. In a divided decision, however, the trial court concluded that the legislation violated two provisions of the Tennessee Constitution: the home rule amendment and a clause exempting metropolitan governments from a twenty-five-member cap on county legislative bodies. Both parties appeal. We affirm the trial court's ruling that subsection 1(a) is not moot. We reverse, however, its conclusion that the statute is barred by either constitutional provision at issue.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CARMA DENNIS MCGEE, J., joined. KENNY ARMSTRONG, J., filed a separate dissenting opinion.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; and Philip Hammersley, Senior Assistant Solicitor General, for the appellants, Bill Lee, Governor of the State of Tennessee; Tre Hargett, Tennessee Secretary of State; and Mark Goins, Tennessee Coordinator of Elections.

Wallace W. Dietz, Allison L. Bussell, Melissa Roberge, John K. Whitaker, Robert E. Cooper, Jr. and Wesley S. Love, Nashville, Tennessee, for the appellees, Metropolitan Government of Nashville & Davidson Co.

David W. Garrison, Scott P. Tift, and John Spragens, for the appellees, Sandra Sepulveda, Judy Cummings, Alma Sanford, Delishia Porterfield, Quin Evans Segall, Zulfat Suara, Dave Goetz, and Davie Tucker.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 9, 2023, 2023 Tennessee Public Chapter 21 ("the Act") was signed into law. Pursuant to subsection 1(a) of the Act, "[n]otwithstanding a provision of a metropolitan government charter or § 7-2-108 to the contrary, the membership of a metropolitan council must not exceed twenty (20) voting members, as further provided in this section."[1] In subsection 1(b), the Act further provided that

(1) If the membership of a metropolitan council is required to be reduced in order to comply with subsection (a), then:

(A) The metropolitan council reduction takes effect as of the next general metropolitan election after the effective date of this act. However, if the metropolitan council fails to take the necessary legislative action to effectuate this section prior to the qualifying date for the next general metropolitan election after the effective date of this act as set by the county election commission, then the terms of the current members of the metropolitan council are extended for one (1) year and the county election commission shall set a special general metropolitan election to be held the first Thursday in August 2024 to elect the councilmembers for a term of three (3) years with the terms to begin September 1, 2024. Thereafter, members of the metropolitan council shall serve terms of four (4) years;
(B) Within thirty (30) days of the effective date of this act, the metropolitan planning commission shall establish district boundaries using the most recent federal census to ensure that a reapportionment maintains substantially equal representation based on population and otherwise complies with the United States and Tennessee constitutions and state and federal law;
(C) Upon approval of the council districts by the planning commission, the metropolitan council as currently constituted shall approve the new council district boundaries by resolution on or before May 1, 2023; and
(D) The metropolitan council shall take any legislative action required to effectuate this section by resolution receiving an affirmative majority vote of

---

[1] The Act was later codified as Tennessee Code Annotated sections 7-1-113, related to metropolitan councils, and 6-53-104, relating to municipal councils. We will follow the lead of the parties and the trial court, however, and cite to the Act throughout this Opinion.

those present and voting, regardless of any provision of a charter or private
act to the contrary.

2023 Tenn. Pub. Chapter 21 § 1(b).

The Act further provided that the cap on membership would apply to metropolitan governments formed after the effective date of the Act and did not prohibit the metropolitan government from either specifying in its charter the manner in which to hold a special election to fill a vacancy on the council or, by a change to the metropolitan charter, reducing its membership to fewer than twenty members in the future. *Id.* § 1(c)–(e). Section 2 of the Act contained similar limitations on the membership of municipal governing bodies. *See generally id.* § 2. Finally, section 3 of the Act provided that

If any provision of this act or its application to any person or circumstance is held invalid, then the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to that end, the provisions of this act are severable.

*Id.* § 3. The Act became effective upon its enactment. *Id.* § 4.

Two separate lawsuits were filed in the Davidson County Chancery Court ("the trial court") in relation to the enactment of the Act against Respondent/Appellant the State of Tennessee ("the State"). First, on March 13, 2023, the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro Nashville"), filed a complaint seeking a declaratory judgment and injunctive relief preventing the Act, which Metro Nashville coined as the Metro Nashville Reduction Act, from being implemented. Therein, Metro Nashville asserted that in forcing Metro Nashville to halve its current metropolitan council (from forty members to twenty members) without local voter approval, the Act violated the Local Legislation Clause of the Home Rule Amendment to the Tennessee Constitution, which prohibits the Tennessee General Assembly from passing "local" or "special" laws "applicable to a particular county or municipality." Tenn. Const. art. XI, § 9. In support of this argument, Metro Nashville noted that while two other counties had chosen to form a consolidated metropolitan government, only Metro Nashville's metropolitan council had more than twenty members and therefore it would be the only government subject to a reduction under the Act.

Metro Nashville further argued that the Act violated the Tennessee Constitution's Consolidation Clause, in that Metro Nashville was created pursuant to the Home Rule Amendment and granted the power to determine its own structure of government via its charter.[2]

---

[2] The Home Rule Amendment is contained in Article 11, Section 9 of the Tennessee Constitution. Generally, the Home Rule Amendment "vest[s] control of local affairs in local governments, or in the people, to the maximum permissible extent." *Farris v. Blanton*, 528 S.W.2d 549, 551 (Tenn. 1975). This

Finally, Metro Nashville argued that the Act violated the Exemption Clause of the Tennessee Constitution, which placed a twenty-five-member cap on the membership of county legislative bodies but specifically exempted metropolitan governments from this rule. Tenn. Const. art. VII, § 1.

On March 28, 2023, a group of eight Davidson County voters ("the Tucker Plaintiffs") filed a similar complaint for declaratory and injunctive relief in ***Tucker et al. v. Lee***, No. 23-0395-111. A three-judge panel was assigned to hear these matters based on the constitutional challenge to the Act,[3] and the two complaints were eventually consolidated.

On April 10, 2023, the trial court issued a unanimous opinion ruling that Metro Nashville was likely to prevail on its constitutional challenge to subsection 1(b) of the Act under the Local Legislation Clause and that a temporary injunction against implementation of subsection 1(b) should be entered. The trial court ruled, however, that Metro Nashville was unlikely to prevail on its constitutional challenges to subsection 1(a).[4] Metro Nashville therefore was not required to comply with the council-reduction provision contained in subsection 1(b) during the August 2023 local election.[5]

Following that election, the parties filed cross-motions for summary judgment. The State argued that the case should be dismissed because the Act was not unconstitutional. Moreover, the State asserted that any challenge to subsection 1(b) was moot as the deadlines contained in that subsection had passed. In its motion, Metro Nashville conceded that its challenge to subsection 1(b) was moot but argued that subsections 1(a) and 1(b) were inextricably linked, such that neither subsection now carried the force of law. Metro Nashville also argued that subsection 1(a) of the Act was unconstitutional. The Tucker Plaintiffs joined in Metro Nashville's arguments.

On July 29, 2024, the trial court issued an order granting in part and denying in part the competing motions. First, the trial court ruled that it would confine its review to only subsections 1(a) and 1(b) of the Act, as other provisions of the Act were "not applicable to or challenged in this action." The trial court then unanimously held that the claims challenging subsection 1(b) of the Act were moot, as the parties had conceded. But the trial court further ruled that the mootness of subsection 1(b) did not render subsection 1(a) moot at well. The trial court then ruled that subsection 1(a) did not violate the Consolidation Clause. But two members of the three-judge panel concluded that subsection 1(a) of the

argument was not raised in the appeal, so we need not tax the length of this Opinion with a discussion thereof.

[3] *See* Tenn. Code Ann. § 20-18-101.

[4] The trial court's decision as to the Exemption Clause was unanimous; Chancellor Patricia Head Moskal dissented as to the Local Legislation Clause ruling.

[5] The forty members of the Metro Nashville council were therefore elected to four-year terms that will expire in September 2027.

Act was unconstitutional as it violated both the Local Legislation Clause and the Exemption Clause.[6] The trial court concluded, however, that subsection 1(a) of the Act could be elided from the remaining portions of the Act, leaving subsections 1(c), 1(d), 1(e), and section 2 of the Act intact. So the trial court permanently enjoined enforcement of only subsection 1(a) of the Act. Judge Joseph T. Howell dissented in part, however, and concluded that the Act violated neither the Local Legislation Clause nor the Exemption Clause, such that the Act—save the moot subsection 1(b)—should be enforced in its entirety.[7] The State thereafter promptly appealed to this Court.

## II. ISSUES PRESENTED

The State raises two issues in this appeal, which are taken and slightly restated from its brief:

1. Whether the trial court erred by holding that § 1(a) violates the Exemption Clause, which is set forth in Tennessee Constitution article VII, § 1.
2. Whether the trial court erred by holding that § 1(a) violates the Local Legislation Clause, which is set forth in Tennessee Constitution article XI, § 9.

In the posture of appellee, Metro Nashville argues that the undisputed mootness of subsection 1(b) of the Act also renders subsection 1(a) moot.[8]

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's decision on a motion for summary judgment de novo with no presumption of correctness. *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1, 12 (Tenn. 2021) (citing *Tatham v. Bridgestone Ams. Holding, Inc.*, 473 S.W.3d 734, 748 (Tenn. 2015)).

Likewise, we determine the constitutionality of a statute de novo with no presumption of correctness afforded to the trial court's legal conclusions. *Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 712 (Tenn. 2017). "Generally, whether a claim is moot involves a question of law that this Court will [also] review de novo." *Huggins v.*

---

[6] The trial court also ruled that the Tucker Plaintiffs lacked standing to pursue some of their claims. The trial court's ruling on standing has not been challenged in this appeal.

[7] Judge Howell was assigned to the panel in March 2024, after then-panel member the Honorable Mary L. Wagner was confirmed to the Tennessee Supreme Court.

[8] The Tucker Plaintiffs filed a separate brief in this Court, but merely incorporated the arguments raised by Metro Nashville. Thus, for brevity, we will refer solely to the argument of Metro Nashville in this appeal.

*McKee*, 500 S.W.3d 360, 375 (Tenn. Ct. App. 2016).

## IV. ANALYSIS

### A.

At its most fundamental level, this case represents a power struggle between State government and local government. The Tennessee General Assembly, the legislative branch of the State of Tennessee, generally wields considerable power, limited by the other co-equal branches and constitutional requirements. *Cf., e.g.*, **Bowling v. Carnahan**, 171 Tenn. 26, 100 S.W.2d 232, 235 (1937); **S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.**, 58 S.W.3d 706, 710 (Tenn. 2001). In contrast, local governments, like Metro Nashville, "derive the whole of their authority solely from the General Assembly[.]" **S. Constructors, Inc.**, 58 S.W.3d at 710. Thus, "Article II, section 3 of our Constitution confers upon the General Assembly the whole of the state's legislative power, and with limited exception, the General Assembly has the sole and plenary authority to determine whether, and under what circumstances, portions of that power should be delegated to local governments." **Id.** at 711 (internal citation omitted). As a result, "without some form of constitutional authorization, local governments in Tennessee possess only those powers and authority as the General Assembly has deemed appropriate to confer upon them." **Id.** at 711–12.

An amendment to the Tennessee Constitution in 1953 altered this power dynamic. Importantly, the Constitution was amended to allow "municipal governments to adopt and operate under home rule authority[.]" **Id.** at 714 (citing Tenn. Const. art. XI, § 9). "The effect of the home rule amendments was to fundamentally change the relationship between the General Assembly and these types of municipalities, because such entities now derive their power from sources other than the prerogative of the legislature." **Id.**[9]

Within this amendment, Tennessee also permitted counties to form consolidated metropolitan governments. *See generally* **Frazer v. Carr**, 210 Tenn. 565, 569, 360 S.W.2d 449, 451 (Tenn. 1962). Specifically, Article 11, section 9 of the Tennessee Constitution states that:

> The General Assembly may provide for the consolidation of any or all of the governmental and corporate functions now or hereafter vested in municipal corporations with the governmental and corporate functions now or hereafter vested in the counties in which such municipal corporations are located; provided, such consolidations shall not become effective until submitted to the qualified voters residing within the municipal corporation and in the county outside thereof, and approved by a majority of those voting within the

---

[9] The Home Rule Amendment is discussed in more detail, *infra*.

municipal corporation and by a majority of those voting in the county outside the municipal corporation.

Tenn. Const. art. XI, § 9, cl. 9. This amendment, however, was "not self-executing" and needed to be implemented via legislative enactments. *Frazer*, 360 S.W.2d at 451. The General Assembly therefore enacted a statute to effectuate the amendment, which permits each county in this state to consolidate "all, or substantially all, of their governmental and corporate functions" with the municipal corporations within the county, resulting in "the creation and establishment of a new metropolitan government to perform all, or substantially all, of the governmental and corporate functions previously performed by the county and by the municipal corporations, the voters of which approve the consolidation." Tenn. Code Ann. § 7-1-103(a).

Under the consolidated metropolitan form of government, the legislative body is referred to as the metropolitan council and wields "all the authority and functions of the governing bodies of the county and cities being consolidated, with such exceptions and with such additional authority as may be specified elsewhere in chapters 1-6 of this title[.]" Tenn. Code Ann. § 7-2-108(a)(11). The metropolitan charter shall also determine "the size, method of election, qualification for holding office, method of removal, term of office and procedures of the metropolitan council, with such other provisions with respect to the council as are normally related to the organization, powers and duties of governing bodies in cities and counties[.]" Tenn. Code Ann. § 7-2-108(a)(12).

Metro Nashville formed a consolidated metropolitan government pursuant to this authority in 1962. Under Metro Nashville's charter, its metropolitan council totals forty voting members, thirty-five from geographic districts and five at-large members.

Section 1 of the Act at issue, however, seeks to limit the size of consolidated metropolitan councils to no more than twenty voting members. There appears to be no dispute that the General Assembly had the power to limit the size of metropolitan councils unless prohibited by the Tennessee Constitution. *See generally* ***Cnty. of Shelby v. McWherter***, 936 S.W.2d 923, 933–34 (Tenn. Ct. App. 1996) ("There is no constitutional provision that prohibits the Legislature from enacting laws which in some form or fashion are contrary to a local law set forth in a county's home rule charter. To the contrary, there is ample authority for the proposition that when the Legislature acts through general legislation, the Legislature retains power over a county, despite the county's home rule status, and this is true even with respect to functions that are governmental or political in nature."); Tenn. Const. art. XI, § 9, cl. 5 ("[N]o charter provision except with respect to compensation of municipal personnel shall be effective if inconsistent with any general act of the General Assembly"). To that end, Metro Nashville argues in this appeal, and a divided panel of the trial court ruled, that subsection 1(a) of the Act is prohibited by two separate provisions of the Tennessee Constitution—the Local Legislation Clause of the

Home Rule Amendment and the Exemption Clause.[10] The State, of course, argues that neither the Local Legislation Cause nor the Exemption Clause prohibit the General Assembly's proper exercise of power through the Act.

Before we reach those constitutional provisions, however, Metro Nashville asserts that any enforcement of subsection 1(a) of the Act has been rendered moot by the undisputed mootness of subsection 1(b). Questions of justiciability such as mootness are often threshold issues. *Northshore Corridor Ass'n v. Knox Cnty.*, 633 S.W.3d 561, 571 (Tenn. Ct. App. 2021) (citing *City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013)). Moreover, this Court has a duty to avoid deciding constitutional issues if the case can be decided on non-constitutional grounds. *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). So we consider Metro Nashville's mootness argument first.

**B.**

Mootness is a judge-made doctrine of judicial restraint:

> Tennessee courts follow self-imposed rules of judicial restraint so that they stay within their province "to decide, not advise, and to settle rights, not to give abstract opinions." *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Co.*, 301 S.W.3d 196, 203 (Tenn. 2009) (internal quotation marks omitted). The mootness doctrine is one such rule: a "case must remain justiciable (remain a legal controversy) from the time it is filed until the moment of final appellate disposition." *Id.* at 203–04. A moot case or issue is one that has lost its justiciability for some reason occurring after commencement of the case. *Id.* at 204. A case, or an issue in a case, becomes moot when the parties no longer have a continuing, real, live, and substantial interest in the outcome. *Id.* at 210.

*Hooker v. Haslam*, 437 S.W.3d 409, 417 (Tenn. 2014). This rule applies in particular to constitutional questions, as "[t]he long and well established rule in this State is that the Court 'will not decide a moot question, though it be the question of constitutionality of a statute.'" *Id.* (quoting *Tenn. Negro Funeral Dirs. Ass'n v. Bd. of Funeral Dirs. & Embalmers of Tenn.*, 206 Tenn. 141, 332 S.W.2d 195, 197 (1960)).

"The central question in a mootness inquiry is whether changes in the circumstances existing at the beginning of the litigation have forestalled the need for meaningful relief." *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994). When a case is rendered moot while an appeal is pending, it "should [be] dismiss[ed,]" unless an exception

---

[10] As previously discussed, Metro Nashville also asserted that the Act violated the Consolidation Clause in the trial court. The trial court, however, unanimously ruled that it did not. That ruling has not been appealed, but the Consolidation Clause is mentioned in other arguments set forth by Metro Nashville.

is present. ***Hooker***, 437 S.W.3d at 433 (quoting ***Norma Faye Pyles Lynch Fam. Purpose LLC***, 301 S.W.3d at 210).

Still, we "do not apply the mootness doctrine mechanically." ***Norma Faye Pyles Lynch Fam. Purpose LLC***, 301 S.W.3d at 204. The Tennessee Supreme Court has therefore recognized that even where a case has become moot, "a court should consider whether to exercise its discretion to apply one of the recognized exceptions to the mootness doctrine." ***Hooker***, 437 S.W.3d at 417. These exceptions are as follows:

> (1) when the issue is of great public importance or affects the administration of justice;
> (2) when the challenged conduct is capable of repetition and is of such short duration that it will evade judicial review;
> (3) when the primary subject of the dispute has become moot but collateral consequences to one of the parties remain; and
> (4) when the defendant voluntarily stops engaging in the conduct.

***Id.*** at 417–18 (quoting ***Norma Faye Pyles Lynch Fam. Purpose LLC***, 301 S.W.3d at 204). Thus, the first question this Court must answer is whether implementation of subsection 1(a) has been rendered moot by the undisputed mootness of subsection 1(b). If we conclude that subsection 1(a) is moot, then we must proceed to consider whether a recognized exception to the mootness doctrine should be applied in this Court's discretion.

Metro Nashville's mootness argument rests largely on the language of the Act and the purported necessity of subsection 1(b) to the implementation of subsection 1(a). Specifically, Metro Nashville points out that the State concedes, as it must, that while implementation of the Act was stayed by the trial court, the deadlines for action contained in subsection 1(b) passed and Metro Nashville simply cannot comply with those deadlines. Metro Nashville further argues that the cap on metropolitan council membership in subsection 1(a) is "qualifie[d]" by the language that the cap is to be effected "as further provided in this section[,]" i.e., in subsection 1(b). According to Metro Nashville, this language indicates the Tennessee General Assembly's intent that the two subsections work in concert to effect the Act's purpose. In other words, Metro Nashville argues that the Act should be interpreted in such a way that the validity of subsection 1(a) is conditioned on the effectiveness of subsection 1(b), given the "as further provided" language. And given that Metro Nashville cannot comply with subsection 1(b), it argues that the Act imposes no ongoing obligation to reduce the size of its metropolitan council membership. Thus, Metro Nashville argues that the undisputed ineffectiveness of subsection 1(b) is also fatal to enforcement of subsection 1(a).

The State disagrees with Metro Nashville's reading of the Act. Rather, the State argues that subsection 1(a) imposes ongoing legal obligations on all metropolitan governments in the state and that it operates independently of subsection 1(b). As for the

"as further provided" language, the State argues that this language merely clarifies the details about how subsection 1(a) operates, in that after-formed metropolitan governments must comply with the twenty-member cap and all metropolitan councils are permitted under the Act to have less than twenty members. As for subsection 1(b), the State argues that it is only a transitional provision that does not affect the validity of the remaining portions of the Act.

It appears that Metro Nashville posits a fairly novel argument. Indeed, neither party cites any caselaw from this state or elsewhere in which a court was tasked with determining whether the mootness of one subsection of an act, and in particular mootness due to the passage of time while the statute was enjoined, should alone necessitate invalidation of other portions of the act.[11] In the trial court, the State likened this question to an issue of elision, which applies "where the valid portion of the statute is not so dependent upon the portion said to be void that the Court cannot presume that the Legislature would not have enacted the valid portion in the absence of the inclusion within the enactment of that portion which is said to be void." *Davidson Cnty. v. Elrod*, 191 Tenn. 109, 111–12, 232 S.W.2d 1, 2 (1950). The trial court rejected this argument, however, concluding that because subsection 1(b) was not declared unconstitutional, elision did not apply.[12] *See Willeford v. Klepper*, 597 S.W.3d 454, 470 (Tenn. 2020) ("Under the doctrine of elision, a court may, under appropriate circumstances and in keeping with the expressed intent of a legislative body, elide an **unconstitutional** portion of a statute and find the remaining provisions to be constitutional and effective." (emphasis added) (quoting *Lowe's Cos., Inc. v. Cardwell*, 813 S.W.2d 428, 430 (Tenn. 1991))). *But see* Tenn. Code Ann. § 1-3-110 ("It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the code would otherwise be unconstitutional **or ineffective**. If any one (1) or more sections, clauses, sentences or parts shall **for any reason** be questioned in any court, and shall be adjudged unconstitutional **or invalid**, such judgment shall not affect, impair or invalidate

---

[11] To the extent that Metro Nashville asserts that *County of Shelby v. McWherter* stands for this proposition, we disagree. In that case, the plaintiffs raised several challenges to the constitutionality of a law affecting school boards. 936 S.W.2d at 925. We declined to consider an argument that a transitional provision of the challenged act was unconstitutional, as the passing of the deadlines contained in the provision rendered that challenge moot. *Id.* at 931–32. As the State points out, the fact that one subsection of the challenged act containing certain provisional directives was moot did not prevent this Court from considering the remaining constitutional challenges to the act. *See id.* at 932–36. Thus, this case actually suggests that the mootness of one provision of an act due to an injunction preventing certain deadlines from being met does not result in the invalidation of the act as a whole. But it does not appear that this argument was raised in *County of Shelby v. McWherter*, so there is some question as to its precedential value in this case. *See Staats v. McKinnon*, 206 S.W.3d 532, 550 (Tenn. Ct. App. 2006) ("It is axiomatic that judicial decisions do not stand for propositions that were neither raised by the parties nor actually addressed by the court." (citing *Shousha v. Matthews Drivurself Serv., Inc.*, 210 Tenn. 384, 390, 358 S.W.2d 471, 473 (Tenn. 1962))).

[12] As previously discussed, the trial court nevertheless unanimously concluded that subsection 1(a) was not moot.

the remaining provisions thereof, but shall be confined in its operation to the specific provision or provisions so held unconstitutional or invalid, and the inapplicability or invalidity of any section, clause, sentence or part in any one (1) or more instances shall not be taken to affect or prejudice in any way its applicability or validity in any other instance." (emphasis added)). The State appears to have abandoned any argument in favor of elision in this appeal.

Given that Metro Nashville's argument focuses on the language of the Act, we apply our familiar rules of statutory construction to this issue. As the Tennessee Supreme Court has previously explained in this context:

> The cardinal canon of statutory construction requires the courts to ascertain and to carry out the General Assembly's intent. A statute's intent is reflected in the statute's words, and, therefore, we must focus initially on the words of the statute. When the words of the statute are clear and unambiguous, we need not look beyond the statute, but rather, we must simply enforce the statute as it is written.

*Norma Faye Pyles Lynch Fam. Purpose LLC*, 301 S.W.3d at 213 (citations omitted). Moreover, we must consider the whole text of the statute and the overall statutory framework, ensuring that we "interpret each word 'so that no part will be inoperative, superfluous, void or insignificant.'" *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022) (quoting *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 228 (Tenn. 2010)). In other words, "[i]n interpreting statutes, . . . we are required to construe them as a whole, read them in conjunction with their surrounding parts, and view them consistently with the legislative purpose." *Coffman v. Armstrong Int'l, Inc.*, 615 S.W.3d 888, 897 (Tenn. 2021) (quoting *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 897 (Tenn. 2011)). Like the other issues in this case, statutory construction is an issue of law that is amenable to summary judgment. *Metro. Dev. & Hous. Agency v. Trinity Marine Nashville, Inc.*, 40 S.W.3d 73, 76 (Tenn. Ct. App. 2000).

In essence, Metro Nashville contends that to treat the "as further provided in this section" language in subsection 1(a) as if it does not exist violates statutory principles. And based on the plain language of the Act, subsection 1(b) is "the sole implementation mechanism" by which existing metropolitan councils with too many members may reduce their membership. So then, the mootness of subsection 1(b) renders subsection 1(a) moot, in turn.

We note, however, that statutes must also be construed "with the saving grace of common sense." *State ex rel. Maner v. Leech*, 588 S.W.2d 534, 540 (Tenn. 1979). Thus, "a construction which impairs, frustrates or defeats the object of a statute should be avoided[.]" *Id.* (citing *First Nat'l Bank v. McCanless*, 186 Tenn. 1, 207 S.W.2d 1007 (Tenn. 1948)). Moreover, while "we presume that every word in a statute has meaning and

- 11 -

purpose and should be given full effect," this rule applies only "if the obvious intention of the General Assembly is not violated by so doing" *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008) (citing *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005)).

The obvious intention of the Tennessee General Assembly in enacting section 1 as a whole was to place a cap on the membership of metropolitan councils that applies to both existing councils and future councils.[13] *Cf. Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 213 (stating that our primary goal in statutory construction is to "carry out the General Assembly's intent"). Our legislature also clearly and unequivocally expressed its intent that invalid portions of the Act could be severed from valid portions. *See* 2023 Tenn. Pub. Chapter 21 § 3 (providing that if any provision of the Act was "held invalid" the invalid portion could be severed so long as the other provisions could be given effect without the invalid portion).[14] The Tennessee Supreme Court has held that "[t]he inclusion of a severability clause" in an act is "evidence [of] an intent on the part of the legislature to have the valid parts of the statute in force" despite the invalidity of other portions of the statute. *Gibson Cnty. Special Sch. Dist. v. Palmer*, 691 S.W.2d 544, 551 (Tenn. 1985) (involving unconstitutionality). Thus, while the doctrine of elision may not be strictly applicable here,[15] the severability clause itself is evidence of the Tennessee General Assembly's intent that subsection 1(a)'s validity was not purposefully and compulsorily qualified or conditioned on the validity of subsection 1(b) or any other subsection.

Moreover, the plain language of the Act does not lead us to conclude that subsection 1(b) is necessary to either the operation of subsection 1(a) or to carry out the intent of the legislature. *Cf. generally Frost v. City of Chattanooga*, 488 S.W.2d 370, 373 (Tenn. 1972) ("The general rule is that, . . . 'where a clause is so interwoven with other portions of an act as that we cannot suppose that the legislature would have passed the act with that clause omitted, then if such clause is declared void, it renders the whole act null.'" (quoting *Hobbs v. Lawrence Cnty.*, 193 Tenn. 608, 615, 247 S.W.2d 73, 76 (Tenn. 1952))). As an initial matter, Metro Nashville offers no legal authority mandating that the Tennessee General Assembly adopt specific provisions directing Metro Nashville in how to implement the Act's twenty-member cap.[16] *Cf. Civ. Serv. Merit Bd. v. Burson*, 816 S.W.2d 725 (Tenn.

---

[13] Although in this appeal Metro Nashville focuses on the unconstitutionality of subsection 1(a) alone, we do not consider statutory language in a vacuum but with reference to all of its component parts. *See In re Est. of Davis*, 308 S.W.3d 832, 839 (Tenn. 2010) ("Rules of construction establish that statutory language cannot be considered in a vacuum, but 'should be construed, if practicable, so that its component parts are consistent and reasonable.'" (quoting *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (Tenn. 1968))).

[14] The term "invalid" is not defined by the Act. Generally, the term means that something is "[n]ot legally binding[.]" *Invalid*, *Black's Law Dictionary* (9th ed. 2009).

[15] Given the State's choice to abandon its reliance on elision, we express no opinion as to whether the doctrine is applicable when a portion of a statute has been rendered moot.

[16] Metro Nashville instead argues that whether the Tennessee General Assembly *could have* passed the Act without subsection 1(b) is irrelevant because they *did* pass the Act with the inclusion of subsection

1991) (involving a general law that altered the qualifications of members of civil service merit boards without including specific guidance as to how Knox County, the only county required to make changes to comply with the act, was to meet this aim, other than specifying that the legislation did not abridge the term of any incumbent member of the board but would apply upon a vacancy).[17] While it may be true that the Tennessee General Assembly intended subsection 1(b) to be the sole implementation mechanism applicable to Metro Nashville *when that subsection was of legal effect*, there is no language in the Act to suggest that should subsection 1(b) become invalid, the aims of the statute should also die or that existing metropolitan governments could not take other appropriate action to meet that aim going forward. *Cf.* **State v. Bonds**, 502 S.W.3d 118, 162 (Tenn. Crim. App. 2016) ("As near as one body can reason the collective minds of another body, we believe the legislature would choose the survival of subsection (c) and the remaining provisions of Section 40-35-121 as opposed to the death of the entire statute."). Thus, even though Metro Nashville is not bound by the specific deadlines imposed by subsection 1(b), nothing appears to prevent it from nevertheless meeting the overarching aims of subsection 1(a) going forward.[18]

Still, we concede that the "as further provided in this section" language points to the General Assembly's intent that an existing metropolitan government with a council membership exceeding twenty voting members would comply with subsection 1(b) in order to effectuate that goal. But that is not the only provision that was "further provided" in section 1 of the Act. Subsections 1(c), 1(d), and 1(e) all provide guidance as to how the overarching rule imposed by subsection 1(a) is to be implemented on an ongoing basis. *See* 2023 Tenn. Pub. Chapter 21 § 1(c) (involving how the cap would apply to newly formed metropolitan governments), (d) (permitting the metropolitan government to specify in its charter how vacancies would be filled), (e) (permitting metropolitan governments to make future changes to the size of their councils so long as membership does not exceed twenty members). Reading these subsections as providing specific and clarifying guidance as to how subsection 1(a)'s general rule is to be implemented does not render any part of the Act surplusage, but is instead the most reasonable reading of the Act as a whole to further the intent of the legislature. *Cf.* **Atl. Richfield Co. v. Christian**, 590 U.S. 1, 14 n.5 140 S. Ct. 1335, 1350, 206 L. Ed. 2d 516 (2020) (noting that the legislature may "employ[] a belt and suspenders approach" to ensure that its purpose is achieved and that sometimes it is better to read a statute as including "some redundancy") (citation omitted). Thus, it does not appear that subsection 1(b)'s guidance was so integral to the functioning of subsection 1(a) or section 1 as a whole that subsection 1(a) cannot survive its mootness.

Finally, there is perhaps even more reason to uphold the remaining portions of the

---

1(b).

[17] **Burson** is discussed in detail, *infra*.

[18] The specifics of how Metro Nashville chooses to accomplish those aims are not within the scope of this appeal.

Act in this case than in the context of a partially unconstitutional statute. While the unconstitutionality of a legislative act may result from the good faith, yet mistaken belief in the legislation's validity by our General Assembly, the mootness of subsection 1(b) results solely from the injunction put in place by the trial court.[19] It would certainly frustrate the intent of the legislature to hold that an entire act, or at least a large portion thereof, could be invalidated solely because a discrete portion of the legislation was rendered ineffective by a challenge to the act making its way through our courts, regardless of the success of that challenge on its merits. *See* **State ex rel. Maner**, 588 S.W.2d at 540 (noting that we should avoid a construction that frustrates the object of a statute). Rather, it is our conclusion that the Tennessee General Assembly did not intend for a construction of the Act that would defeat its very object and which would result in the death of the statutory scheme as it applied to existing metropolitan governments simply because litigation meant certain deadlines for jurisdictions to make the changes necessary under the Act could not be complied with. *Id.* So we conclude that while subsection 1(b) is undisputedly moot, subsection 1(a) should not be construed as being conditioned or qualified by that provision. As a result, subsection 1(a) continues to carry the force of law unless prohibited by one of the constitutional provisions raised by Metro Nashville. We therefore proceed to address those questions.

### C.

The State next argues that the trial court erred in ruling that the Act violated what the parties refer to as the Exemption Clause of the Tennessee Constitution. In evaluating this issue, we begin with the presumption that the acts passed by our legislature are constitutional. *See* **Willeford**, 597 S.W.3d at 465 ("In evaluating the constitutionality of a statute, we begin with the presumption that an act of the General Assembly is constitutional." (quoting **Gallaher v. Elam**, 104 S.W.3d 455, 459 (Tenn. 2003))). Consequently, we "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." **Gallaher**, 104 S.W.3d at 459 (quoting **State v. Taylor**, 70 S.W.3d 717, 721 (Tenn. 2002)).

Article VII, section 1 of the Tennessee Constitution provides certain requirements applicable to local legislative bodies. In particular, the second paragraph of section 1 states as follows:

---

[19] Hypothetically, if subsection 1(b) was not moot and a court were to conclude that this section was unconstitutional, it is arguable that the purportedly unconstitutional provision could be elided from the Act. *See generally* **Willeford**, 597 S.W.3d at 471 ("[T]he legislature's endorsement of elision does not automatically make it applicable to every situation; however, when a conclusion can be reached that the legislature would have enacted the act in question with the unconstitutional portion omitted, then elision of the unconstitutional portion is appropriate." (quoting **In re Swanson**, 2 S.W.3d 180, 189 (Tenn. 1999))). Therefore, it is somewhat nonsensical to suggest that an arguably unconstitutional provision that is not in effect will be more fatal to the legislature's intended purpose than an arguably unconstitutional provision that is in effect.

> The legislative body shall be composed of representatives from districts in the county as drawn by the county legislative body pursuant to statutes enacted by the General Assembly. Districts shall be reapportioned at least every ten years based upon the most recent federal census. The legislative body shall not exceed twenty-five members, and no more than three representatives shall be elected from a district.

Tenn. Const. art. VII, § 1, cl. 2. The clause further provides, however, that "[a]ny county organized under the consolidated government provisions of Article XI, Section 9, of this Constitution shall be exempt from having a county executive and a county legislative body as described in this paragraph." *Id.*

There is no dispute that Metro Nashville is organized under the consolidated government provisions referred to above. As a result, the trial court ruled that the Act was an unconstitutional attempt to avoid the application of the Exemption Clause, noting that the General Assembly could not "accomplish by statute that which is expressly prohibited under the [Tennessee] Constitution."

On appeal, the State argues that the trial court misconstrued the Exemption Clause as prohibiting the General Assembly's valid exercise of power through the Act. While the State concedes that the twenty-five-member cap contained in Article VII, section 1 does not apply to Metro Nashville or any other consolidated metropolitan government, the State asserts that nothing in that provision restricts the legislature from imposing such a statutory cap on metropolitan council membership.

Metro Nashville concedes in its brief that, despite the trial court's apparent conclusion to the contrary, "the Constitution does not explicitly prohibit the General Assembly from altering legislative body size for metropolitan governments." But Metro Nashville contends that the inquiry is not ended by this fact. Rather, it asserts that the language of Article VII, section 1 should be read to "exempt[] consolidated city/county governments from **any** limit on the size of their legislative bodies[.]" (Emphasis added).

In construing a constitutional provision, "we begin by reading the plain language and giving terms 'their ordinary and inherent meaning.'" *McNabb v. Harrison*, -- S.W.3d --, 2025 WL 730065, at \*3 (Tenn. Mar. 7, 2025) (quoting *State v. Phillips*, 159 Tenn. 546, 21 S.W.2d 4, 5 (Tenn. 1929)). We therefore "construe a constitutional provision as it is written" and "[w]hen a constitutional provision has a clear meaning[,]" we do not apply another meaning or create an ambiguity. *Id.* (citations omitted). Finally, when the Constitution is silent as to an issue within the legislature's purview, it has been held that the subject is left to the sound discretion of the legislature. *See Caruthers v. Andrews*, 42 Tenn. 378, 381 (Tenn. 1865) ("The constitution of 1796 was silent upon the subject of interest, leaving that subject to the sound discretion of the legislature. In other words, there

- 15 -

was no constitutional inhibition upon the legislature, upon the subject of interest."); *see also **McFarland v. Pemberton***, 530 S.W.3d 76, 86 (Tenn. 2017) ("It is well settled that the power of the Legislature, except as restrained by the Constitution, is supreme . . . in the creation of subordinate governmental agencies, and in prescribing their powers and duties." (quoting ***Waldauer v. Britton***, 172 Tenn. 649, 113 S.W.2d 1178, 1181 (1938))).

Here, the plain language at issue does two things. First, it mandates that legislative bodies meet certain requirements, including that the legislative body's membership not exceed twenty-five members. Then, it states that counties organized under a metropolitan government are exempt from the restrictions contained "in this paragraph." Nothing in this language, however, indicates that other restrictions that derive outside of "this paragraph" are prohibited. Nor does the plain language of this paragraph in any way circumscribe the power of the General Assembly to legislate the membership of metropolitan councils.

A somewhat similar argument was rejected by the Tennessee Supreme Court in ***Bailey v. County of Shelby***, 188 S.W.3d 539, 544 (Tenn. 2006). In ***Bailey***, current members of the Shelby County Board of Commissions challenged term limits adopted in the Shelby County Charter under Article VII, section 1 of the Tennessee Constitution. On appeal, the plaintiffs argued, inter alia, that Article VII, section 1 should be construed "as establishing terms of four years with no limit." ***Id.*** at 544 (citing Tenn. Const. art. VII, § 1, cl. 1 ("The qualified voters of each county shall elect for terms of four years a legislative body, a county executive, a Sheriff, a Trustee, a Register, a County Clerk and an Assessor of Property.")).

The Tennessee Supreme Court disagreed with this reading of the Tennessee Constitution:

> Although it is true that Article VII states that county officials shall be elected for "terms of four years," we do not construe this phrase to mean that such officials must be capable of being elected to more than one term. Rather, the phrase "terms of four years" merely refers to the duration of each term. There is nothing in the language of the constitution to prevent a county from placing a limit on the number of terms that may be served.

***Id.*** at 544–45.

Metro Nashville advances essentially the same argument that the plaintiffs in ***Bailey*** employed. It asks this Court to read Article VII, section 1 so expansively that not only are metropolitan governments exempt from the explicit twenty-five-member cap contained in that paragraph, but also the legislature is prohibited from exercising its power to impose any such cap on a metropolitan government. But there is simply "nothing in the language of the constitution to prevent" the Tennessee General Assembly from imposing its own limit on the voting membership of a metropolitan council. ***Id.*** Given that we must "indulge

- 16 -

every presumption and resolve every doubt in favor of the statute's constitutionality," we cannot condone interpreting the Tennessee Constitution's silence such that the legislature's power is curtailed in this manner. ***Gallaher***, 104 S.W.3d at 459; *see also* ***Waldauer***, 113 S.W.2d at 1181. We therefore conclude that the limitation on membership imposed by section 1 of the Act does not violate Article VII, section 1's Exemption Clause.

## D.

Finally, we turn to consider whether subsection 1(a) of the Act violates the Local Legislation Clause of the Home Rule Amendment to the Tennessee Constitution. This clause provides as follows:

> [A]ny act of the General Assembly private or local in form or effect applicable to a particular county or municipality either in its governmental or its proprietary capacity shall be void and of no effect unless the act by its terms either requires the approval by a two-thirds vote of the local legislative body of the municipality or county, or requires approval in an election by a majority of those voting in said election in the municipality or county affected.

Tenn. Const. art. XI, § 9, cl. 2. The intent of the Local Legislation Clause was "to strengthen local self-government." ***Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.***, 645 S.W.3d 141, 149 (Tenn. 2022) (citation omitted). Indeed, "[t]he whole purpose of the Home Rule Amendment was to vest control of local affairs in local governments." ***S. Constructors, Inc.***, 58 S.W.3d at 714 (quoting ***Burson***, 816 S.W.2d at 729).

In determining whether the Local Legislation Clause is implicated in a particular situation, three requirements must be met: "1) the statute in question must be local in form or effect; 2) it must be applicable to a particular county or municipality; and 3) it must be applicable to the particular county or municipality in either its governmental or proprietary capacity." ***Metro. Gov't***, 645 S.W.3d at 150. If the legislation implicates the Local Legislation Clause but does not require approval by a majority of the county or municipality's local legislative body or voters, it is unconstitutional and void. *See* ***id.*** In this appeal, the question of whether the statute in question is local in form or effect is dispositive. We therefore confine our analysis to that question.

While the phrase "private or local in form or effect" is not defined by the Tennessee Constitution, courts have understood the term in the negative—that is, it does not constitute a general law. ***Metro. Gov't of Nashville & Davidson Cnty. v. Tennessee Dep't of Educ.***, No. M2020-00683-COA-R9-CV, 2020 WL 5807636, at *6 (Tenn. Ct. App. Sept. 29, 2020), *aff'd in part, rev'd in part on other grounds*, 645 S.W.3d 141 (Tenn. 2022).[20] And

---

[20] The Tennessee Supreme Court held that a different element required to demonstrate the

- 17 -

a general law is "one 'neither for one or more particular persons, nor to operate exclusively in particular part or parts of a state.'" *Id.* (quoting *Nashville Gas & Heating Co. v. City of Nashville*, 152 S.W.2d 229, 234 (Tenn. 1941)). In order to determine whether a law is general, the Tennessee Supreme Court has explained,

> The test is not the outward, visible or facial indices, nor the designation, description or nomenclature employed by the Legislature. Such a criterion would emasculate the purpose of the amendment. The whole purpose of the Home Rule Amendment was to vest control of local affairs in local governments, or in the people, to the maximum permissible extent. The sole constitutional test must be whether the legislative enactment, irrespective of its form, is local in effect and application.

*Farris v. Blanton*, 528 S.W.2d 549, 551 (Tenn. 1975). In applying this test, we are directed to "determine whether th[e] legislation was designed to apply to any other county in Tennessee, for if it is potentially applicable throughout the state it is not local in effect even though at the time of its passage it might have applied to [a single county] only." *Id.* at 552. "But in determining potential applicability we must apply reasonable, rational and pragmatic rules as opposed to theoretical, illusory or merely possible considerations." *Id.*

Here, there is no dispute that three counties have formed metropolitan governments: Nashville and Davidson County, Lynchburg and Moore County, and Hartsville and Trousdale County. There is also no dispute that only Metro Nashville's metropolitan council exceeds the new twenty-member cap. Based on these undisputed facts, a majority of the trial court panel concluded that the Act was local in nature, explaining

> Only Metro is required to make any changes as the size of the legislative bodies of the other two is 20 or less. . . . The potential that Section 1(a) could apply theoretically to Lynchburg-Moore County or Hartsville-Trousdale County sometime in the future in the event they were to propose amendments to their charters to increase the size of their legislative bodies to more than twenty (with the design to run afoul of Section 1(a)) and such charter amendments were approved by local voters, seems speculative and illusory, and not a reasonable or rational application of Section 1(a). . . . Section 1(a) is not a statute of statewide application; indeed, its application to a lone county is the clearest possible example of local in effect.

The State argues that the trial court was incorrect in its conclusion as to the applicability of subsection 1(a). Rather, the State argues that subsection 1(a), considered as a whole, applies to all governments that currently or potentially could adopt a

---

applicability of the Local Legislation Clause was lacking. *Metro. Gov't*, 645 S.W.3d at 151–54. So the court limited its analysis to only that element. *Id.* at 150.

metropolitan form of government, with subsection 1(b) adding transitional provisions to help Metro Nashville accomplish the purpose of the Act.

In support of this argument, the parties focus on a series of cases involving the Local Legislation Clause. The first, *Farris v. Blanton*, involved legislation providing for run-off elections in counties with a mayor as the head of the county government. 528 S.W.2d at 550. Members of the Shelby County Quarterly Court filed a declaratory judgment action, asserting that the legislation violated the Local Legislation Clause of the Home Rule Amendment. *Id.* at 550–51. The trial court, however, ruled that the act was constitutional. *Id.* at 551.

On appeal, the Tennessee Supreme Court first noted that ninety-three counties had the conventional form of county government headed by a County Judge or Chairman, Davidson County had formed a consolidated government, and only Shelby County vested the executive and administrative powers of the county in a county mayor. *Id.* at 552. As a result,

> Shelby County stands unique among the counties in Tennessee. It, and it alone, has a county mayor. No other county may have such a form of government except by the affirmative action of the General Assembly. There is no general enabling act under which any other county may opt to so operate. Thus, [the subject legislation] relates to Shelby County alone.

*Id.*

The proponents of the run-off election legislation nevertheless argued that the act could also apply to the mayor of a metropolitan government. *Id.* at 552. But the court determined that a consolidated metropolitan government "stands on entirely different footing." *Id.* While the challenged legislation applied to "elections for mayor in a county with a mayor as head of the executive or administrative branch," a metropolitan mayor is not "a county mayor," but instead "the chief executive officer of a consolidated entity[.]" *Id.* at 551–53. The court therefore held that "it is a fallacy to attempt to equate the County Mayor of Shelby County with" the mayor of a consolidated metropolitan government. *Id.* at 553. Our supreme court also rejected the argument that the law was not local in effect because it was generally applicable to all counties "which now or hereafter have a mayor as head of the executive or administrative branch." *Id.* at 555. It noted that no other county could form such a government structure without an act of the Tennessee General Assembly, emphasizing that "the run-off law applies solely to Shelby County under the present laws of the State of Tennessee. We cannot conjecture what the law may be in the future." *Id.* So the court held that the subject legislation was local in effect and void under the Local Legislation Clause. *Id.* at 556.

The Tennessee Supreme Court addressed a similar issue in *Civil Service Merit*

***Board of the City of Knoxville v. Burson***. In ***Burson***, members of the City of Knoxville's civil service merit board challenged the enactment of a statute that would "make uniform the qualifications and procedures for the nomination of members serving on the municipal civil service boards in Tennessee's most populous counties." 816 S.W.2d at 727. Specifically, the challenged legislation applied only to the civil service boards in counties with populations greater than 300,000 but excluded municipalities with a mayor-alderman form of government. *Id.* at 728.

Current members of the civil service merit board argued that this legislation violated the Local Legislation Clause. *Id.* The trial court denied the challenge, ruling that the law applied to civil service merit boards in both Davidson and Shelby Counties, as well as "boards of municipalities located in counties that may grow to meet the act's population requirements[.]" *Id.*

In affirming the decision of the trial court, the Tennessee Supreme Court first noted that "[n]ot every statute that affects a single county will automatically be found to be unconstitutional[.]" *Id.* at 729. Indeed, the court noted that prior legislation was upheld as constitutional even where it applied only to Davidson County, as the single county that had formed a metropolitan government at that time. *Id.* (citing, e.g., ***Doyle v. Metro. Gov't***, 225 Tenn. 496, 471 S.W.2d 371 (Tenn. 1971)). The court distinguished those cases from ***Farris*** in that the law permitting counties to form metropolitan governments was still in existence, whereas no counties could elect a mayor at the time of ***Farris*** without action by the Tennessee General Assembly. *Id.* (citing ***Farris***, 528 S.W.2d at 554–55).

Applying this to the legislation at issue, the ***Burson*** court concluded that because, in effect, the legislation applied to three counties who met both the population and mayor-alderman requirements, it did not constitute local legislation. *Id.* at 730. Importantly, the court noted that even though only one of these three counties would be required to take affirmative action to comply with the law, this fact did not alter its conclusion:

> It is true in this case that because existing civil service commissions in Davidson County and Shelby County are already in compliance with the provisions of [the challenged legislation], only the Knoxville board will be required to take affirmative steps to comply with the statute. On the other hand, civil service commissions in the other two counties are certainly *affected* by the statute, because they will have to maintain compliance with [it] in the future.

*Id.* Moreover, population changes could result in additional counties "eventually becom[ing] subject to the provisions of [the challenged act]." *Id.* Thus, the court held that the subject law was not local in effect and therefore did not require local approval to withstand constitutional scrutiny. *See also* ***Bd. of Educ. of Shelby Cnty. v. Memphis City Bd. of Educ.***, 911 F. Supp. 2d 631, 656 (W.D. Tenn. 2012) (citing ***Burson*** and holding that

the Local Legislation Clause "does not require that legislation apply to 'every part of' or 'everywhere' in Tennessee").

The State contends that **Burson** is controlling and mandates that we reverse the decision of the trial court. Like the legislation in **Burson**, the Act applies to three counties that have adopted metropolitan governments, as well as any future counties that adopt such a form of government. Moreover, just like in **Burson**, only a single county, Davidson, will be required to take affirmative steps to alter the membership of its metropolitan council, as the other two counties are already in compliance with the Act. Still, those counties will be required to maintain their compliance in the future. So then, the State asserts that this Court should follow the precedent set in **Burson** and hold that the Act does not violate the Local Legislation Clause.

Metro Nashville contends, however, that **Burson** does not control here. Rather, Metro Nashville contends that while the legislation in **Burson** applied uniformly to all three applicable counties, that is not the case under the Act. Instead, Metro Nashville asserts, it alone is subject to unique and unreasonable provisions forcing it to reduce its metropolitan council on an expedited timeline and by specific measures, i.e., pursuant to subsection 1(b).

In response, the State points out that the only way that Metro Nashville attempts to demonstrate that it is treated any differently under the Act is by pointing to subsection 1(b). But as Metro Nashville so forcefully emphasizes, subsection 1(b)'s mandates are moot and therefore no longer impose any requirements on Metro Nashville.

Moreover, the State asserts that even if subsection 1(b) should be considered in determining whether the Act violates the Local Legislation Clause, subsection 1(b)'s requirements are nothing more than "transitional provisions" that have previously withstood Local Legislation Clause scrutiny. In support of this argument, the State cites **State ex rel. Maner v. Leech**, 588 S.W.2d 534 (Tenn. 1979). In **Maner**, the Tennessee Constitution was amended to rework the general framework for county government. But the constitutional provisions were not self-executing. **Id.** at 537. The Tennessee General Assembly "responded with a carefully considered and comprehensive plan of implementation[.]" **Id.** at 538. The newly enacted legislation provided both "the specifics of the new basic structure for county government" and "an orderly method of transition." **Id.**

In its effort toward this second goal, the legislature adopted transitional provisions applicable only to Knox County, which "very properly balanced the existing situation in Knox County against the demands for interim adherence to an ultimate standard set by the legislature to provide a constitutional and basic form of government." **Id.** at 539. In relevant part, these transitional provisions provided that if Knox County did not form a consolidated

metropolitan form of government or other type of government by January 1, 1980,[21] then a county executive and county legislative body would be elected at the August 1980 election. *Id.* at 540.

The plaintiffs filed suit, arguing that the special provisions applicable to Knox County violated the Local Legislation Clause. *Id.* at 536. The trial court agreed, but the Tennessee Supreme Court reversed. Given the statute's stated purpose of "assur[ing] orderly election of county officers, minimum disruption . . . and continuity of county government[,]" and the upheaval that would have been caused to Knoxville without any transitional provisions, the court held that the Tennessee General Assembly "acted responsibly and on a reasoned and rational basis in providing a hiatus in the implementation of" the new form of government to Knox County alone. *Id.* at 540–41. The court thus concluded that "[h]ere we deal with a general law of statewide application, containing transitory provisions necessitated because of unique conditions in certain specified counties." *Id.* at 541. So the Tennessee Supreme Court held that these transitional provisions withstood scrutiny under the Local Legislation Clause. *Id.*

According to the State, *Maner* demonstrates that the inclusion of specific provisions necessary for a single county to adjust to new legislation does not transform an otherwise law of general application into local legislation. But Metro Nashville argues that *Maner* and other similar cases involving transitional provisions are distinguishable from this case because the laws at issue were enacted in order to execute a constitutional amendment. *See also Marion Cnty. Bd. of Comm'rs v. Marion Cnty.*, 594 S.W.2d 681, 683 (Tenn. 1980) (upholding a law that contained specific provisions to "bring Marion County into synchronization with the general statutory scheme" required by an amendment to the Tennessee Constitution); *Leech v. Wayne Cnty.*, 588 S.W.2d 270, 274 (Tenn. 1979) (holding that a law exempting two counties from a law of general application based on a narrow population bracket could not "be justified as a transitional part of a general restructuring scheme"). Metro Nashville therefore asserts that the flexibility that the Tennessee Supreme Court employed in *Maner* is inapplicable to a case involving a legislative enactment that was not made necessary by a constitutional amendment.

In resolving this dispute, we remember that it is our duty "to resolve every reasonable doubt in favor of the constitutionality of a legislative enactment[.]" *Maner*, 588 S.W.2d at 536. Moreover, we look to the effect of section 1 of the Act in a pragmatic manner, rather than dealing in hypotheticals. *Farris*, 528 S.W.2d at 552. Applying these principles, we must conclude that the inclusion of subsection 1(b)'s now-moot transitional provisions does not render subsection 1(a) a local law violative of the Local Legislation Clause.

---

[21] A vote to determine whether Knox County would form a metropolitan government was pending at the time of the enactment of the legislation at issue in *Maner*. *Id.* at 539–40.

While it is true that Tennessee courts' previous consideration of transitional provisions under the Local Legislation Clause has involved legislative enactments required to effectuate constitutional amendments, nothing in those cases states that their analysis is confined to only that type of legislation. Rather, the cases apply roughly the same Local Legislation Clause analysis that was employed in *Burson*. Indeed, the presumption in favor of the constitutionality of our statutes applies with equal force regardless of whether legislation was enacted to execute a constitutional amendment or otherwise. *See, e.g.*, *McWherter*, 936 S.W.2d at 936 (applying the "strong" presumption to legislation that was not precipitated by a constitutional amendment); *Maner*, 588 S.W.2d at 536 (applying the presumption to legislation required to effectuate a constitutional amendment). Moreover, courts in both situations based their conclusions not on the catalyst of the legislature's enactment of the subject provisions, but on the fact that the laws were generally applicable and only necessitated transitional provisions due to the special circumstances present in certain counties. *See, e.g.*, *Burson*, 816 S.W.2d at 729–30; *Maner*, 588 S.W.2d at 540–41.

The same is true in this case. Here, of the three counties currently governed by a consolidated metropolitan form of government, only Davidson County's metropolitan council has a membership that exceeds the new statutory cap. Thus, in order to bring Davidson County "into synchronization with the statutory scheme," the Tennessee General Assembly enacted subsection 1(b). *Marion Cnty. Bd. of Comm'rs*, 594 S.W.2d at 683. But these transitional provisions simply do not transform subsection 1(a) of the Act from what it clearly is: a law of general application applicable to all counties that have formed a consolidated metropolitan government or will do so in the future.

Moreover, there is even less risk here that subsection 1(b)'s transitional provisions have altered the fundamental nature of section 1 from a law of general application to a law local in effect. As repeatedly pointed out by both parties in this case, subsection 1(b) is moot and the State has correctly conceded that it cannot be enforced. Thus, in reality, Metro Nashville has already succeeded in invalidating what it deems the expedited and unreasonable timeline imposed by subsection 1(b). So Metro Nashville's insistence that we invalidate subsection 1(a) of the Act due to the purported locality of subsection 1(b) alone is an argument divorced from the reality that subsection 1(b) is of no legal effect and therefore places no ongoing special or unique burdens on Metro Nashville. *Cf. Farris*, 528 S.W.2d at 552.

In reaching this conclusion, we note that a different panel of this Court recently came to the opposite conclusion regarding another statute enacted by the Tennessee General Assembly in 2023. Specifically, in *Metropolitan Government of Nashville and Davidson County v. Governor Bill Lee et al.*, Metro Nashville argued, inter alia, that a statute vacating the existing boards of airport authorities and appointing new commissions to staggered terms ending in 2028 targeted Metro Nashville alone. No. M2023-01678-COA-R3-CV, 2025 WL 1218089, at *1–2 (Tenn. Ct. App. Apr. 28, 2025). The new law applied if three conditions were met: (1) the county had a metropolitan form of

- 23 -

government; (2) the county had a population exceeding 500,000 based on the 2020 federal census or a subsequent federal census; and (3) the county had established a metropolitan airport authority. *Id.* at \*8 (citing 2023 Tenn. Pub. Acts, ch. 488, § 2(1)(A)). The only Tennessee county to meet all three requirements was Metro Nashville. A three-judge panel therefore concluded that the law established "a closed class of counties" that could only apply to Davidson County. *Id.* at \*9–10. As a result, the trial court declared the subject law local in effect and therefore in violation of the Local Legislation Clause. *Id.* at \*4.

This Court affirmed the decision of the trial court that the law was local in effect. *Id.* at \*10. As the Court explained,

> Although the original Metropolitan Airport Authority Act was enacted in 1969, only four counties have established metropolitan airport authorities since that time. Assessing the likelihood or immediacy of other counties doing so would be clear speculation. In addition, although there will likely be population growth in other counties, a new federal census will not be released until 2030 at the earliest. Given the timeframes set forth in section two of the Act for expiration of the new board members' initial terms, the only other county that could meet the population threshold within those timeframes was Shelby. No other county in Tennessee could possibly comply with the population requirement until 2030. Most importantly, of the counties meeting the first two requirements, Davidson County is the only county with a metropolitan form of government. No evidence was presented that Shelby County had impending plans to adopt such a form of government. Accordingly, the layering of the statute's applicability requirements renders the possibility that the Act could apply to any other county theoretical at best. We therefore conclude that the trial court correctly determined section two of the Act to be local legislation.

*Id.*

The facts in the above case are readily distinguishable from the present action. In that case, the law contained "layer[ed]" applicability requirements that meant that application beyond Metro Nashville was not only not imminently feasible, but also unlikely to potentially arise in the future. Here, other than the transitional provisions that are undisputedly moot and of no effect, section 1 of the Act clearly applies to all counties that have formed or will form a consolidated metropolitan government. And even subsection 1(a) alone applies to all three existing metropolitan governments regardless of the fact that only one of those governments will have to take affirmative action to bring itself into compliance with the Act. *See Burson*, 816 S.W.2d at 730. Thus, the "class created" by section 1 of the Act, is not "so narrowly designed that only one county can reasonably, rationally, and pragmatically be expected to fall within that class[.]" *Metro. Gov't*, 2025 WL 1218089 at \*9 (quoting *Bd. of Educ. of Shelby Cnty.*, 911 F. Supp. 2d at 656). We

therefore reverse the decision of the trial court that subsection 1(a) of the Act is local in effect and therefore void in violation of the Local Legislation Clause of the Home Rule Amendment.

## V. CONCLUSION

The judgment of the Davidson County Chancery Court is affirmed in part and reversed in part. The permanent injunction against enforcement of subsection 1(a) of 2023 Tennessee Public Chapter 21 is dissolved, and this matter is remanded to the trial court for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellees, the Metropolitan Government of Nashville and Davidson County, Tennessee, Davie Tucker, Delishia Porterfield, Judy Cummings, Dave Goetz, Alma Sanford, Quin Evans Segall, Sandra Sepulvada, and Zulfat Suara, for which execution may issue, if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE